# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION
#### www.flsb.uscourts.gov

In Re:                                              Case No.  13-20853 (PGH)
                                                    Chapter 11

TLFO, LLC,

      Reorganized Debtor.

_____/

TRANSUNION RISK AND
ALTERNATIVE DATA SOLUTIONS,
INC.,

          Plaintiff,

      v.                                           Adversary Pro. No. _____(PGH)

INTERACTIVE DATA, LLC,
MARLIN CAPITAL PARTNERS I,
LLC and MICHAEL BRAUSER,

          Defendants.

_____/

## COMPLAINT FOR DECLARATORY JUDGMENT

Brian K. Gart
BERGER SINGERMAN LLP
350 East Las Olas Blvd., Suite 1000
Fort Lauderdale, Florida 33301
Phone (954) 712-5130
Fax: (954) 523-2872

        -and-

Philip D. Anker (admitted *pro hac vice*)
Douglas F. Curtis
Marc M. Allon (admitted *pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center, 250
Greenwich Street
New York, NY 10007
Phone: (212) 230-8800
Fax: (212) 230-8888

*Attorneys for the Plaintiff*

Plaintiff TransUnion Risk and Alternative Data Solutions, Inc. ("TRADS"), as and for its complaint against Defendants Interactive Data, LLC ("Interactive"), Marlin Capital Partners I, LLC ("Marlin"), and Michael Brauser ("Brauser," and together with Interactive and Marlin, the "Defendants"), states and alleges as follows:

**Preliminary Statement**

1.      This is a complaint for a declaratory judgment that TRADS owns the core assets it acquired from the above-captioned (now-reorganized) debtor (the "Debtor"[1]), free and clear of an extraordinarily belated claim of Defendants, who claim to have acquired certain of those assets long after their sale to TRADS from a former employee and equity owner of the Debtor.

2.      In December 2013, TRADS acquired substantially all of the assets of the Debtor (the "Acquired Assets"), as more fully set forth in the sale order entered by this Court [ECF No. 610[2]] (the "Sale Order").[3]  TRADS paid the Debtor $154 million for the Acquired Assets, a substantial sum that permitted the Debtor to pay all creditor claims in full and provide a meaningful return to equity.

3.      The Sale Order provided that the sale of the Acquired Assets to TRADS (the "Sale"), pursuant to Sections 363(b), (f), and (h) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), was, *inter alia,* "free and clear of all liens, claims, encumbrances, and other interests."  Sale Order, at p. 11.  Thus, the Sale Order expressly ordered, adjudged, and decreed that TRADS "is a good faith purchaser of the Acquired Assets,

---

[1] At the time of the Sale (as defined below) the Debtor was called TLO, LLC.  It subsequently changed its name to TLFO, LLC.

[2] Except where otherwise noted, all ECF Nos. referenced in this Complaint refer to the docket in the Debtor's chapter 11 case, Case No. 13-20853 (S.D. Fla.) (PGH).

[3] Capitalized terms not defined herein shall the meaning ascribed to them in the Sale Order.  The full terms of the Sale are set forth in that certain asset purchase agreement attached to the Sale Order as Exhibit A (as amended or modified, the "Stalking Horse APA"), [ECF No. 610-1].

free and clear of Interests, and is hereby granted and entitled to all of the protections provided to such a good faith purchaser under section 363 of the Bankruptcy Code . . .".  Sale Order, at p. 20.

4.      The core of the Debtor's business was its intellectual property, including the BParser code converter software (the "BParser Code") and the BOLT software language ("BOLT") (collectively, with any other intellectual property in which Defendants claim an interest, the "IP").  The IP was included in the Acquired Assets sold to TRADS.  Without the IP, TRADS would not have paid $154 million for the Acquired Assets.

5.      In connection with the Sale, the Debtor represented that it was the sole owner of the IP.  Upon information and belief, the IP was created by a large team of over 40 employees of the Debtor, including Ole Poulsen ("Poulsen"), the Debtor's then-Chief Science Officer.  Upon information and belief, this team used the Debtor's hardware to create the IP, and its members, including Poulsen, were compensated by the Debtor for their work.  The Debtor represented to TRADS that any involvement by Poulsen had been in his capacity as an employee of the Debtor and for the benefit of the Debtor.  Thus, the IP was work made for hire, in which Poulsen never had any ownership interest; indeed, to the best of TRADS's knowledge, Poulsen asserts no such ownership interest.

6.      Nevertheless, before closing the Sale and paying $154 million to the Debtor, TRADS required that the Sale Order confirm, *inter alia*, that its acquisition of the IP was free and clear of any possible claim by Poulsen.  This Court's Sale Order so confirmed.

7.      This Court has already found and determined both that the Debtor provided Poulsen with advance notice of the Sale by mailing all documents to him, and that Poulsen

consented to the Sale by failing to object.  Sale Order, at pp. 4 & 11-12.  Those findings have

never been challenged or disturbed.  Sale Order, at pp. 4 & 11-12.

8.       Moreover, the Debtor served the Sale Order on Poulsen.

9.       Despite repeatedly receiving notice of the Sale and the Sale Order, Poulsen has

never objected to the Sale, appealed the Sale Order, or sought to modify the Sale Order.  Thus,

even if prior to the Sale Poulsen held any interest in the IP, he consented to the Sale of the IP free

and clear of any interest he held therein, and the Defendants could purchase no interest in the IP

from him.  *See, e.g.*, Sale Order, at p. 11-12.

10.      The story as to Brauser and Interactive is the same. The Debtor served the Sale

Order on both Brauser and Interactive over nine months ago and both failed to object to the Sale

Order.

11.      The sale of the IP to TRADS, along with all the other Acquired Assets, closed on

December 16, 2013 (the "Closing").  As this Court has already found and determined, TRADS

relied upon the fact that it would be acquiring the IP free and clear of all interests and claims,

including Poulsen's, in making its decision to offer $154 million in the bidding process, and that

finding and determination has never been disturbed.  *See* Sale Order, at p. 14.  Subsequent to the

Sale, TRADS has relied upon the Sale Order and the fact that it purchased the IP free and clear

of all assets in running its business.

12.      After the Closing, Poulsen and Brauser had extensive and ongoing involvement in

the Debtor's bankruptcy case, primarily concerning the division of the Sale proceeds paid by

TRADS, further demonstrating their knowledge of the Sale and its implications.  Yet, neither

Poulsen, nor the Defendants, has ever moved for reconsideration of, moved for relief from, or

taken any other actions to modify or abrogate this Court's Sale Order.

13.     The Sale of the IP and other Acquired Assets to TRADS free and clear of any interest cannot be undone at this late date.  The Sale Order ordered, adjudged, and decreed that "if any or all of the provisions of this Order are hereafter reversed, modified, or vacated by a subsequent order of this Court or any other court, such reversal, modification, or vacatur shall not affect the validity and enforceability of the Sale or any sale, transfer or assignment under the Stalking Horse APA or obligation or right granted pursuant to the terms of this Order (unless stayed pending appeal prior to the Closing) . . .".  Sale Order, at p. 20.  Similarly, the Sale Order ordered, adjudged, and decreed that "[a]ny party objecting to this Order must exercise due diligence in filing an appeal, pursuing a stay and obtaining a stay prior to the Closing, or risk its appeal being foreclosed as moot."  Sale Order, at pp. 38-39.  However, despite receiving notice, neither Poulsen nor Defendants objected to the Sale or appealed the Sale Order—not even after the Sale was closed.  *See* Sale Order, at p. 20.

14.     It was only on or about October 15, 2014, more than 10 months after the Closing, that Defendants, acting through Brauser, informed TRADS that they had purported to purchase any interests Poulsen might have had in the IP, and asserted two related claims against TRADS: first, Defendants asserted that Poulsen had an ownership interest in the IP; second, Defendants asserted that Poulsen did not receive adequate notice of the sale of the IP, rendering the Sale Order ineffective with regard to Poulsen.  Thus, despite Poulsen's and Interactive's actual knowledge that, pursuant to the Sale Order, the IP had long ago been sold to TRADS free and clear of any legal interest that Poulsen conceivably held in it, Defendants have asserted that they have magically acquired an actual and enforceable legal interest in the IP.

15.     Because TRADS rejects each and every part of Defendants' claims and their conclusions, this dispute constitutes an "actual controversy" within the meaning of 28 U.S.C. §

- 4 -

2201 and Fed. R. Bankr. P. 7001(9) between TRADS and Defendants regarding the ownership of the IP prior to the Sale, the effect of the Sale Order, the adequacy of the notice to Poulsen, the effect of Poulsen's failure to object to the Sale, and the resulting ownership of the IP. Therefore, to enforce this Court's Sale Order, TRADS requests a declaration that (1) the IP was the exclusive property of the Debtor before the Sale and (2) in any event, upon the issuance of the Sale Order and subsequent Sale, any claims by Poulsen to rights in the IP were extinguished, and the IP passed free and clear to TRADS. In addition, TRADS is entitled to injunctive relief barring Defendants from ever attempting to collect license fees or other payments from TRADS on account of the IP.

## Parties

16.    Plaintiff TransUnion Risk and Alternative Data Solutions, Inc. is a Delaware corporation with its principal place of business at 555 West Adams Street, Chicago, Illinois, and is authorized to transact business in the State of Florida.

17.    Defendant Interactive Data, LLC is a Georgia limited liability corporation. Upon information and belief, its principal place of business is 3057 Peachtree Industrial Boulevard, Suite 100, Duluth, Georgia.

18.    Defendant Marlin Capital Partners I, LLC, is a Florida limited liability corporation. Upon information and belief, its principal place of business is 4400 Biscayne Boulevard, Suite 850, Miami, Florida.

19.    Defendant Michael Brauser is, upon information and belief, a resident of Florida, and regularly conducts business at 4400 Biscayne Boulevard, Suite 850, Miami, Florida. Upon information and belief, Brauser is the majority or controlling shareholder in Interactive, and manages Marlin.

**Jurisdiction and Venue**

20.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.  Venue of this adversary proceeding is proper in this District pursuant to 28 U.S.C. § 1409(a).  This is a "core matter" under 28 U.S.C. § 157 in that, among other things, it concerns an "order[] approving the sale of property" of the estate.  28 U.S.C. § 157(n).  Pursuant to paragraph 51 of the Sale Order, this Court retained jurisdiction over the issues implicated in this adversary proceeding.[4]

**Background**

i.   *The Creation and Importance of the IP*

21.     The Debtor's business had several components, but, as relevant here, its core business consisted of collecting and running searches across numerous databases simultaneously in order to identify patterns and locate individuals and other information.   BOLT is an "[a]pplication component that is comprised of a proprietary language and sets of scripts that are written in Bolt that are the core of the IP that link the disparate data sets together."  Schedule 1.1(a)(ii) to the Stalking Horse APA, [ECF No. 610-4], at 35.  The BParser Code is "the 'code converter' application that converts BOLT code to C++," a universal programming language.  *Id.* Together, this IP formed a component that acted as a "binding agent" for the heart of the Debtor's business, which is allowing it to manage and analyze diverse data, and was a primary

---

[4] Specifically, the Sale Order provided that the Court "retain[ed] jurisdiction to (a) interpret, implement and enforce the terms and provisions of th[e Sale] Order, the Bidding Procedures Order, and the Stalking Horse APA, including all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith, in all respects, and (b) to decide any disputes concerning this Order, the Bidding Procedures Order or the Stalking Horse APA, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Stalking Horse APA, the Bidding Procedures Order or th[e Sale] Order including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Acquired Assets and any Assigned Contracts and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the Acquired Assets to the Buyer free and clear of all Interests."  Sale Order, at p. 39

driver of the $154 million in consideration (without any holdback relating to the IP) that TRADS paid in the Sale.

22.    The IP was created for the Debtor by a number of the Debtor's employees in the course of their employment at the Debtor, and thus was the exclusive property of the Debtor at all times.  *See* Stalking Horse APA, § 2.6(f)(i), [ECF No. 610-1].  Upon information and belief, Poulsen, the Debtor's then-Chief Science Officer, worked on developing the IP in his capacity as an employee of the Debtor.  Indeed, upon information and belief, 40 or more programmers employed by the Debtor were also involved in creating the IP.  Upon information and belief, the IP was created using the Debtor's hardware, and stored on the Debtor's servers, and the development of this core IP was at the heart of the scope of duties of the employees who worked on it.  Upon information and belief, Poulsen was a full-time employee of the Debtor when he worked on the IP, and received significant compensation in return.

23.    Specifically, upon information and belief, Poulsen received payments from the Debtor and Hank Asher, the principal shareholder and founder of the Debtor, and had his expenses paid for by them.  Upon information and belief, the Debtor or Asher also paid for the homes that Poulsen leased in his name during the years of his employment, in return for his services provided to the Debtor.  In addition, upon information and belief, any payments made by the Debtor or Asher to Poulsen or to others on Poulsen's behalf were in return for his efforts as Chief Science Officer of Debtor, and were an aspect of Debtor's employment of Poulsen.

24.    Thus, any role that Poulsen had in the creation of the IP was as part of his duties as an employee of the Debtor, and was done with the assistance of other employees and utilizing resources of the Debtor.  *See* Disclosure Schedules to Stalking Horse APA, § 2.6(f), [ECF No. 610-5].

ii.    *The Sale of the IP to TRADS Free and Clear*

25.    The Debtor sold the IP to TRADS as part of the Sale, free and clear of all Interests (as defined in the Sale Order).  Specifically, paragraph T of the Sale Order provided that "[t]he Debtor may sell, convey and assign the acquired Assets to the Buyer free and clear of all Interests . . .".  Sale Order, at p. 10.  Section 1.9 of the Stalking Horse APA expressly provides that, "except for the Assumed Liabilities" (not applicable here), "Debtor's sale, transfer, conveyance, assignment and delivery of the Acquired Assets to [TRADS] shall be free and clear of all Interests, including Security interests . . . of any kind or character . . .".  Sale Order, Exhibit D, at 12.  *See also id*. at 1-2, § 1.1(a)(ii).  In addition, Section 1.1(a)(ii) of the Stalking Horse APA defined the IP listed in Schedule 1.1(a)(ii) as an "Intellectual Property" that is an "Acquired Asset."  *Id*.  This included the IP.  *See* Stalking Horse APA, Schedule 1.1(a)(ii).

26.    In connection with the Sale this Court expressly and specifically found and determined that:

> [T]o the extent that Ole Poulsen holds or asserts any interests of any kind in the BParser code converter software used or useful by the Debtor in the conduct of the Business (the "BParser Code") or any other Business Assets, such BParser Code and other Business Asset shall be deemed an Acquired Asset and may be sold to the Buyer free and clear of all such interests pursuant to section 363 (f) and/or 363 (h) of the Bankruptcy Code because (among other reasons) such interests are in bona fide dispute and Ole Poulsen has been provided actual notice of and an opportunity to object to and be heard with respect to the Sale and he did not timely file an objection.

Sale Order, at p. 12.

27.    The Sale of the IP free and clear of any interest of Poulsen's was a material element of the Sale and the APA, and this Court has held that TRADS relied upon it in deciding whether to acquire those Assets at all and in determining how much to pay for them.  Sale Order,

at p. 14.  If the core asset of the Debtor were to be acquired subject to the ownership claims of Poulsen and others, TRADS would not have paid, without financial protection, anything close to $154 million.  *Id*.

**iii.    *Certain Defendants' Pre-Sale Involvement in the Bankruptcy Proceedings***

28.    Upon information and belief, Brauser is now the manager of Marlin.  Upon information and belief, either on his own, with Marlin, or through Marlin, Brauser is, functionally, Interactive's largest, if not its majority, shareholder, and he has acted on behalf of Interactive in its interactions with TRADS.

29.    Brauser was involved in the Debtor's bankruptcy proceedings almost from the beginning.  Upon information and belief, Brauser was approached as a source of exit financing prior to the filing of the bankruptcy petition by the Debtor.  However, upon information and belief, after he failed to gain control of the Debtor's board of directors in return for providing exit financing in advance of the petition, Brauser proceeded to form Data Acquisition Group, LLC ("DAG"), with Jules Kroll ("Kroll") (then a profit interest holder and creditor of the Debtor), Thomas Glocer ("Glocer") (then also a profit interest holder and creditor of the Debtor), and several others.  Upon information and belief, Kroll and Glocer proceeded to transfer their claims against the Debtor to DAG, in which Brauser was a significant equity holder, and of which Brauser was a manager.  Brauser also formed, held equity in, and acted as a manager of Applied Data Sciences, LLC ("ADS").  Upon information and belief, prior to the Sale, Brauser used DAG and ADS in several attempts to acquire various assets of and related to the Debtor throughout the bankruptcy.

30.    For instance, upon information and belief, prior to the entry of the Sale Order, Brauser, acting through DAG and ADS, filed a proposed Joint Plan of Reorganization, under

which Brauser would have made decisions on behalf of those two companies.  *See* Disclosure Statement in Support of Joint Plan of Reorganization, [ECF No. 261], at 2.  Additionally, upon information and belief, Brauser, once more acting through DAG and ADS, attempted and failed to purchase Technology Investors, Inc.'s secured claim against the Debtor.

iv.    ***Repeated Service Resulting in Consent to the Sale***

31.    Upon information and belief, the Sale Order and other Sale-related documents were served upon Poulsen, Brauser, Interactive, and certain individuals now closely associated with Defendants but previously associated with Debtor.

32.    Specifically, upon information and belief Furr & Cohen, P.A., the Debtor's bankruptcy counsel ("Furr & Cohen"), served the Sale Order on Defendants.  In addition, Furr & Cohen served the Sale Order on Derek Dubner ("Dubner") (then the Debtor's general counsel, now Interactive's CEO), James Reilly ("Reilly") (then an employee of the Debtor, now an employee of Interactive), and Daniel MacLachlan ("MacLachlan") (then the Debtor's CFO, now an employee of Marlin).[5]  *See* ECF No. 694, at  pp. 6, 10, 15, and 16.

33.    Additionally, Furr & Cohen caused a copy of the Order Approving Bidding Procedures and Notice of Bid Deadline, Auction, and Sale Hearing (the "Order Approving Bidding Procedures"), [ECF. No. 351], to be mailed Poulsen at his then-address of record, or "2633 SO OCEAN BLVD[,]  BOCA RATON FL, 33487" (Poulsen's "Florida Address"), on October 28, 2013.  *See* Certificate of Service Regarding Order Approving Bidding Procedures, [ECF No. 369-1], at 5.  Upon information and belief, this notice was not returned as undeliverable.  Furr & Cohen also served the Order Approving Bidding Procedures, on among others, Interactive, Brauser, and Dubner.  *See* Supplemental Certificate of Service Regarding

---

[5] Brauser was served individually and in connection with his involvement with DAG and ADS. *See* Exhibit A to Certificate of Service, [ECF No. 694], at 2 & 5 (Sale Order sent to ADS via Brauser, and to DAG at same address).

Order Approving Bidding Procedures, [ECF No. 372], at 8 & 10; ECF No. 369-1 at 2 & 21. Upon information and belief, this notice was not returned as undeliverable. In accordance with this Court's order, Furr & Cohen also caused the Notice of the Order Approving Bidding Procedures to be published in three newspapers, including the national edition of the *Wall Street Journal*, in accordance with the terms of that Order on October 28, 2013. *See* Certificate of Service of Sale Notice By Publication, [ECF No. 374].

34.    Upon information and belief, Furr & Cohen further caused copies of the Notice of Filing Stalking Horse APA, [ECF No. 389], and the Debtor's Motion for Order Approving Sale, [ECF No. 390], along with the exhibits thereto, to be mailed to Poulsen at his Florida Address on November 4, 2013. *See* Certificate of Service, [ECF No. 400], at 2. Upon information and belief, this mailing likewise was never returned as undeliverable. Notably, Exhibit A to the Debtor's Motion for Order Approving Sale was a proposed order authorizing, *inter alia*, the same relief as was actually granted by this Court in the Sale Order in paragraphs T and V. *See* ECF No. 390-1, at pp. 27-28. That Motion thus provided Poulsen with clear and unequivocal notice that the IP would be sold, free and clear of any alleged interests he might claim to hold. *See id.*, pages 6-7; ECF No. 390-2, at p. 35.[6]

35.    Upon information and belief, on November 13, 2013, Poulsen contacted Furr & Cohen via email, and requested (i) a copy of the Debtor's disclosure statement and plan of liquidation filed on October 31, 2013 [ECF Nos. 377, 378], and (ii) that his mailing address be updated to 18800 Bull Springs Road, Bend, Oregon 97701 (Poulsen's "Oregon Address") from this Florida Address. Furr & Cohen complied with Poulsen's requests, and promptly caused

---

[6] This motion was also served on Interactive's address, c/o "John O Schaeffer[,] 3057 Peachtree Industrial Blvd[,] Suite 100, Duluth, GA 30097." Certificate of Service, [ECF No. 400], at 5. Upon information and belief, John Schaeffer was the then-President of Interactive Data, and was a creditor of the Debtor. *See* Voluntary Petition, [ECF No. 1], at 47.

Poulsen's mailing address to be updated to his Oregon Address in all relevant records. Thus, Furr & Cohen caused a copy of the Sale Order, as entered by this Court, and the exhibits thereto to be served at Poulsen at his Oregon Address. *See* ECF No. 694, at p. 16.

36.    Notably, the Sale Order expressly found and determined that "timely, adequate, and sufficient notice of the Sale Motion and the relief sought therein . . . the Auction, the Sale Hearing, and the deadlines for filing Stalking Horse APA Objections, objections to the Bidding Procedures, the Sale and the Sale Motion" had been provided, and that "no other or further notice [was] necessary or . . . required." Sale Order, at p. 4. Neither Poulsen, nor Interactive, nor Brauser ever appealed this or any other aspect of the Sale Order, and they certainly did not exercise "due diligence" in pursuing such an appeal, as required by that Order. Sale Order, at p. 39. Nor did they file a motion with this Court to vacate or modify the Sale Order.

37.    In sum, despite being on notice of the clear and unambiguous provisions of the Sale Order and other Sale-related documents that the Sale would be free and clear of any purported interests of Poulsen in the IP, at no point did Poulsen, Interactive, or Brauser ever object to the Sale or appeal the Sale Order, nor did they ever seek to stay the Sale Order pending the resolution of any appeal, despite the warning in the Sale Order of the consequences of the failure to do so. *See*, *e.g.*, Sale Order at pp. 38-39.

**v.    *Defendants' Actual Involvement in the Sale Process***

38.    Defendants' awareness of the Sale and its effects is even more obvious because Brauser and individuals affiliated with the Defendants actually occupied meaningful roles with respect to the Debtor and the Sale.

39.    Specifically, upon information and belief, Brauser, once more acting through DAG and ADS, made a bid for the Debtor as part of the stalking-horse bidding process. In

connection with that bid, on September 17, 2013, Brauser executed a non-disclosure agreement on behalf of DAG, and promised "not to disclose . . . [or] use the [information received] for any purpose other than the evaluation of a possible business transaction between the Parties."  *See* Stalking Horse APA, Schedule 1.1(a)(ix).

40.     Additionally, a number of the Debtor's former employees are now associated with Defendants.  Dubner, now Interactive's CEO, was the Debtor's general counsel during the time of the Sale, and in that capacity, was involved in reviewing and approving many of the Sale-related documents. Similarly, Reilly and MacLachlan both worked for the Debtor at the time of the Sale, and became employees of TRADS following the closing of the Sale.  Indeed, Dubner, Reilly, and MacLachlan were all served with a copy of the Sale Order, *see* Certificate of Service, [ECF No. 694], at Exhibit A, as well as the prior Order Approving Bidding Procedures, *see* Certificate of Service, [ECF No. 369-1], at 16, 18, & 21.  In addition, Dubner and MacLachlan both attended the auction held on November 20-21, 2013 at which the Debtor declared TRADS to have made the highest and best offer for the Acquired Assets.  Accordingly, it simply impossible to believe that Defendants did not know of the Sale and its implications.  By failing to object, Brauser and Interactive likewise consented to the Sale.

vi.    ***Involvement of Poulsen and Brauser in the Debtor's Bankruptcy Case Concerning the Sale Proceeds***

41.     The involvement of the Defendants and Poulsen in the Debtors' bankruptcy case did not end with the Sale.  Shortly after the Closing, Poulsen and Brauser actively participated in the Debtor's bankruptcy case in the hope of obtaining a significant portion of the $154 million paid by TRADS for the Debtor's business, including the IP.

42.     After the Sale Order, one firm, Salazar Jackson, LLP, came to represent Poulsen, DAG, ADS, Dubner, MacLachlan, Kroll, and Glocer.  *See* Corrected Statement of Salazar

Jackson, LLP as to Representation of Multiple Creditors, [ECF No. 850], at 2.  These parties, acting effectively in concert, proceeded to object to various aspects of the Debtor's Amended Plan and the claim for administrative expense status for certain claims made by Mr. Asher's two daughters, who had run the Debtor's operations following the commencement of the bankruptcy case.  *See, e.g.*, ECF Nos. 916 & 1156.  And, several weeks after the Sale Order was mailed to Poulsen, he joined Kroll and Glocer in their Adversary Proceeding against Technology Investors, Inc., the Debtor's largest secured creditor, seeking to have its secured claims recharacterized as equity.  *See* Ad. Pro. No. 13-01943-PGH, ECF No. 17 (Ole Poulsen's Joinder).  Thus, upon information and belief, Brauser, working through intermediaries, and Poulsen remained actively involved in the bankruptcy proceedings for many months after the entry of the Sale Order.  They were obviously well aware of the Sale of the IP to TRADS.  Indeed, the very purpose of their participation in the bankruptcy case was to maximize their take of the Sale proceeds.

43.    Given their participation in these post-Sale matters, there simply can be no dispute that Poulsen, Brauser, and Interactive (in which Brauser is, upon information and belief, a majority or controlling shareholder) were well aware of the terms of the Sale for over 10 months.  During that time, they all chose to take no action concerning Poulsen's purported "ownership" of the IP.  Instead, they sought to maximize their share of the Sale proceeds—an effort entirely at odds with the Defendants' current assertion that the Sale was ineffective.

### vii.    *Defendant's Purported "Purchase" of the IP and Assertion of Interest*

44.    Yet, upon information and belief, at some point after the Sale, Defendants purported to buy Poulsen's interest in the IP, despite the fact the Poulsen never had any ownership interest in the IP because he was compensated to work on it as an employee of the Debtor along with numerous other employees of the Debtor, using the Debtor's hardware.

Moreover, upon information and belief, Defendants purported to purchase the rights to the IP from Poulsen despite the fact that both Defendants and Poulsen were fully aware of (i) the prior Sale of the IP to TRADS and (ii) the undisturbed Sale Order. *See* Sale Order, at pp. 4, 10-11, 20, 22, & 38-39. Accordingly, this purported "purchase" by Defendants can have no effect upon TRADS, which fully owns the IP, free and clear of any interest of Defendants or Poulsen.

45. Additionally, Defendants were fully aware that the Sale Order had extinguished any right Poulsen might once have had in the IP, and knew that it had never been appealed or challenged. Thus, Defendants cannot claim to have made any *bona fide*, good faith purchase of Poulsen's interests. *See* Sale Order, at p. 20, 22, & 38-39. Defendants likewise have never asked this Court to vacate or even modify the Sale Order. *See id*.

46. Nevertheless, on October 15, 2014, Brauser, acting on behalf himself, Interactive, and/or Marlin, telephoned TRADS and spoke with Christopher Cartwright, a TRADS executive. In their conversation and subsequent communications, Brauser asserted Defendants' ownership over the IP on account of its purported purchase of Poulsen's interest in the IP.

**viii.    *Events Leading to Defendants' Assertions of IP Ownership***

47. Notably, Defendants' sudden assertion of its purported "ownership" of the IP arose only after TRADS reminded Dubner, MacLachlan, and Reilly of their obligations under certain confidentiality and non-compete agreements with TRADS.

48. Specifically, Dubner, who, as noted, had previously served as the general counsel of the Debtor prior to and during the Debtor's bankruptcy case and subsequently served in the same role for TRADS after the Sale Closed, left TRADS in June 2014, and in or around October 2014 became the CEO of Interactive. Similarly, on September 26, 2014, Reilly, an employee of the Debtor and, later, TRADS, left TRADS, telling certain officers and employees of TRADS

that he would be doing work for Marlin, the Miami-based private equity firm managed by Brauser.  Upon information and belief, this was false, and Reilly in fact took the position of President and Chief Operating Officer of Interactive in October of 2014.  And in or around October 2014, MacLachlan, the former CFO of the Debtor, began working for Marlin.  Dubner, MacLachlan, and Reilly all were subject to confidentiality agreements executed with the Debtor and TRADS, and MacLachlan and Reilly were both subject to non-compete agreements as well.  On October 9, 2014, TRADS sent letters to Reilly and MacLachlan reminding them of their obligations under these agreements.

49.    Shortly thereafter Brauser called Cartwright and asserted Interactive's purported ownership of the IP.  Thus, Defendants' attempt to circumvent the Sale Order—of which they had actual knowledge—came only after TRADS raised its contractual rights under these confidentiality and non-compete agreements.  Defendants' meritless claim of ownership of the IP is an obvious pretense.

**The Existence of an "Actual Controversy" Between TRADS and Interactive**

50.    Based upon the foregoing, it is clear that an actual controversy exists between TRADS and Defendants over the ownership of the IP prior to the Sale, the validity of the Sale Order, the adequacy of Notice to Poulsen, and the present ownership of the IP.  Thus, while TRADS believes that Poulsen never had any interest in the IP, Defendants evidently assert that he did.  Moreover, while TRADS believes that the Sale Order was effective and that the IP was sold to TRADS free and clear of any interest that Poulsen might have had, Defendants apparently assert that the Sale Order could not affect Poulsen's rights, because he was never properly served with notice of the Sale.  TRADS disputes this assertion, because service was properly accomplished, and takes the position that this Court's Sale Order is effective as written unless

modified by this Court or appealed, neither of which has occurred.  Defendants evidently

disagree, contending that Poulsen still owned the IP, and that they validly purchased it from

Poulsen.  TRADS rejects that position entirely, because Poulsen had nothing to sell, a fact of

which Defendants were fully aware.  Finally, TRADS takes the position that the time to modify

the Sale Order has long since passed, and that Defendants' actions to-date have violated (among

other provisions) ¶ 14 of the Sale Order, at p. 22.

51.     Accordingly, as set forth in 28 U.S.C. § 2201 and Fed. R. Bankr. P. 7001(9), an

"actual controversy" exists between TRADS and Interactive regarding Poulsen's claimed

ownership interest in the IP prior to the Sale, the effect of the Sale Order, the adequacy of the

notice to Poulsen, and the current ownership of the IP.

52.     These fundamental disagreements cannot be resolved except by a declaration of

this Court regarding Poulsen's original ownership interest in the IP, the effect of the Sale Order,

the adequacy of the notice to Poulsen (and Defendants), and the ownership of the IP.

## Count I
## (Declaratory Judgment)

53.     TRADS repeats and incorporates by reference each of the foregoing allegations as

if fully set forth herein.

54.     Pursuant to Fed. R. Bankr. P. 7001(9), Fed. R. Civ. P. 57 and 28 U.S.C. § 2201,

this Court is authorized to issue a declaratory judgment where a "case of actual controversy"

exists within its jurisdiction, and may thus "declare the rights and other legal relations of any

interested party" seeking such a declaration.

55.     An actual controversy exists between TRADS and Defendants concerning

Poulsen's assertion of  any interest in the IP, the effect of the Sale Order, the adequacy of the

notice to Poulsen, and the current ownership of the IP.

56.     This Court should declare that TRADS owns the IP free and clear of any interest of Poulsen and Defendants because Poulsen never had any ownership interest in the IP.  Poulsen was an employee of the Debtor when he worked on the IP, and thus the IP was a work made for hire that was the exclusive property of the Debtor at the time of the Sale.  *See* 17 U.S.C. §§ 101 & 201(b).

57.     In addition, this Court should declare that TRADS owns the IP free and clear of any interest of Poulsen and Defendants because Poulsen was given adequate advance notice of the sale of the IP free and clear of his interests, if any.

58.     This Court should also declare that TRADS owns the IP free and clear of any interest of Poulsen and Defendants because the Debtor sold the IP to TRADS free and clear of Poulsen's interests, if any, and, therefore, he had no interests in the IP to sell to Defendants.

59.     This Court should also declare that even if Poulsen somehow retained some ownership interest in the IP after the Sale to TRADS, that interest was extinguished by virtue of the Sale Order, and Poulsen's failure to appeal the Sale Order and his failure to move for relief from the Sale Order for over 10 months.

60.     This Court should also declare that Defendants are bound by the Sale Order, because they were provided notice of the same and did not object to it and because they purport to take their interest in the IP through Poulsen, who also was provided with notice of the Sale Order and never objected to it.

61.     This Court should also declare that Defendants took any possible interests of Poulsen in the IP with actual knowledge of the terms of the Sale Order.

62.     In addition, this Court should declare that, since Defendants and individuals closely related to them knew of the Sale Order at the time of the purported purchase of the IP

from Poulsen and sought to obtain some or all of the proceeds of the Sale, Defendants are estopped from asserting both that the Sale was ineffective and that they have any ownership interest in the IP.

63.     This Court should also declare that Defendants have violated paragraph 14 of this Court's Sale Order, by interfering and attempting to interfere in TRADS's "use of and enjoyment of the Acquired Assets based on or related to" Poulsen's purported interests.  Sale Order, at p. 22.

64.     In addition, this Court should declare that Defendants are estopped from asserting any ownership interests over the IP for the additional reason that they delayed in asserting such rights, knowing full well that TRADS had paid $154 million to acquire full ownership of the IP. Defendants cannot wait to assert their worthless claim, with full awareness of TRADS's correct belief that it owns the IP in full, in order to harass TRADS and engage in patently unfair business tactics that interfere with TRADS's contractual rights.

65.     Put simply, this Court should declare that TRADS owns the IP in full, and Defendants have no ownership interest in the IP whatsoever.

**Prayer for Relief**

**WHEREFORE,** plaintiff TRADS respectfully requests that this Court:

(a) Declare that:

(i)     Poulsen never had any ownership interest in the IP;

(ii)     Poulsen, as well as the Defendants, were given adequate advance notice of the proposed sale of the IP free and clear of his ownership interests, if any;

(iii)     The IP was sold to TRADS free and clear of Poulsen's interests, if any;

(iv)     Defendants are estopped from seeking to modify or otherwise obtain relief from the Sale Order;

(v)     Defendants are estopped from asserting any ownership interests in the IP; and

(vi)     TRADS owns the IP in full, and Defendants have no ownership interest in the IP; and

(b)     Enter Judgment in favor of plaintiff TRADS;

(c)     Grant plaintiff TRADS such other relief as this Court may deem just and appropriate.

Dated: October 27, 2014

<div style="margin-left: 50%;">

/s/ Brian K. Gart
Brian K. Gart
BERGER SINGERMAN LLP
350 East Las Olas Blvd., Suite 1000
Fort Lauderdale, Florida 33301
Phone (954) 712-5130
Fax: (954) 523-2872

-and-

Philip D. Anker (admitted *pro hac vice*)
Douglas F. Curtis
Marc M. Allon (admitted *pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Phone: (212) 230-8800
Fax: (212) 230-8888

*Attorneys for the Plaintiff*

</div>