### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION
### www.flsb.uscourts.gov

In Re:                                                          Case No.  13-20853 (PGH)
                                                                Chapter 11

TLFO, LLC,

       Reorganized Debtor.

_____/

TRANSUNION RISK AND
ALTERNATIVE DATA SOLUTIONS,
INC.,

          Plaintiff,

      v.                                                 Adversary Pro. No. 14-01793 (PGH)

INTERACTIVE DATA, LLC,
MARLIN CAPITAL PARTNERS I,
LLC, and MICHAEL BRAUSER,

       Defendants.[1]

_____/

### FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

Brian K. Gart
BERGER SINGERMAN LLP
350 East Las Olas Blvd., Suite 1000
Fort Lauderdale, Florida 33301
Phone (954) 712-5130
Fax: (954) 523-2872

      -and-

Philip D. Anker (admitted *pro hac vice*)
Douglas F. Curtis
Marc M. Allon (admitted *pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center, 250
Greenwich Street
New York, NY 10007
Phone: (212) 230-8800
Fax: (212) 230-8888

*Attorneys for the Plaintiff*

---

[1] In light of representations made by The Best One, Inc., that it is the entity that purported to acquire the IP, Plaintiff is filing this amended complaint in order to name that company and drop the existing defendants from this adversary proceeding.   Plaintiff intends to file a motion to change the caption of this action.

Plaintiff TransUnion Risk and Alternative Data Solutions, Inc. ("TRADS"), as and for its complaint against defendant The Best One, Inc. ("TBO" or "Defendant"), states and alleges as follows:

## **Preliminary Statement**

1.      This is a complaint for a declaratory judgment that TRADS owns the core assets it acquired from the above-captioned (now-reorganized) debtor (the "Debtor"[2]), free and clear of an extraordinarily belated claim of Defendant, which claims to have acquired certain of those assets long after their sale to TRADS from a former employee and equity owner of the Debtor.[3]

2.      In December 2013, TRADS acquired substantially all of the assets of the Debtor (the "Acquired Assets"), as more fully set forth in the sale order entered by this Court [ECF No. 610][4] (the "Sale Order").[5]   TRADS paid the Debtor $154 million for the Acquired Assets, a substantial sum that permitted the Debtor to pay all of its creditors in full and provide a meaningful return to equity.

3.      The Sale Order provided that the sale of the Acquired Assets to TRADS (the "Sale"), pursuant to Sections 363(b), (f), and (h) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), was, *inter alia*, "free and clear of all liens, claims, encumbrances, liabilities and other obligations and other interests."  Sale Order, at p. 12.  Thus,

---

[2] At the time of the Sale (as defined below) the Debtor was called TLO, LLC.  It subsequently changed its name to TLFO, LLC.

[3] Simultaneously with the filing of this Amended Complaint, TRADS is filing a Motion to Enforce the Sale Order and for Contempt against TBO in the main bankruptcy proceeding, Case No. 13-20853 (S.D. Fla.) (PGH).  TRADS believes that this Court can afford it full and complete relief pursuant to that motion.  However, in an abundance of caution, and to avoid any prolonged procedural skirmishes, it is also filing this Amended Complaint against TBO.

[4] Except where otherwise noted, all ECF Nos. referenced in this Complaint refer to the docket in the Debtor's chapter 11 case, Case No. 13-20853 (Bankr. S.D. Fla.) (PGH).

[5] Capitalized terms not defined herein shall the meaning ascribed to them in the Sale Order.  The full terms of the Sale are set forth in that certain asset purchase agreement attached to the Sale Order as Exhibit A (as amended or modified, the "Stalking Horse APA"), [ECF No. 610-1].

the Sale Order expressly ordered, adjudged, and decreed that TRADS "is a good faith purchaser of the Acquired Assets, free and clear of Interests, and is hereby granted and entitled to all of the protections provided to such a good faith purchaser under section 363 of the Bankruptcy Code . . . ."  Sale Order, at p. 20.

4.     The core of the Debtor's business was its intellectual property, including the BParser code converter software (the "BParser Code") and the BOLT software language ("BOLT") (collectively, with any other intellectual property in which Defendant claims an interest, the "IP").  The IP was included in the Acquired Assets sold by the Debtor to TRADS. Without the IP, TRADS would not have paid $154 million for the Acquired Assets.

5.     In connection with the Sale, the Debtor represented that it was the sole owner of the IP.  Upon information and belief, the IP was created by a large team of over 40 employees of the Debtor, including Ole Poulsen ("Poulsen"), then the Debtor's Chief Science Officer, and an equity holder in the Debtor.  Upon information and belief, this team used the Debtor's hardware to create the IP, and its members, including Poulsen, were compensated by the Debtor for their work.  The Debtor represented to TRADS that any involvement by Poulsen had been in his capacity as an employee of the Debtor and for the benefit of the Debtor.  Indeed, Poulsen himself has admitted that, from the time of the Debtor's inception, he "agreed to make a contribution of services and time to [the Debtor] . . . in exchange for equity interests in the [Debtor]."  *See* Ole Poulsen's Joinder in Glocer and Kroll's First Amended Complaint for Recharacterization of Claim Numbers 35 and 36 Filed by Technology Investors, Inc. ("Poulsen Joinder"), ¶ 3, at p. 2 [Adv. Proc. No. 13-01943, ECF No. 17].  Thus, the IP was work made for hire, in which Poulsen never had any ownership interest (other than indirectly through his equity interest in the Debtor); indeed, to the best of TRADS's knowledge, Poulsen asserts no such ownership interest.

6. Nevertheless, before closing the Sale and paying $154 million to the Debtor, TRADS required that the Sale Order confirm, *inter alia*, that its acquisition of the IP was free and clear of any possible claim by Poulsen. This Court's Sale Order so confirmed.

7. This Court has already found and determined both that the Debtor provided Poulsen with advance notice of the Sale by mailing all documents to him, and that Poulsen consented to the Sale by failing to object. Sale Order, at pp. 4 & 11-12. Those findings have never been challenged or disturbed. *Id*.

8. Moreover, the Debtor served the Sale Order on Poulsen.

9. Despite repeatedly receiving notice of the Sale and the Sale Order, Poulsen has never objected to the Sale, appealed the Sale Order, or sought to modify the Sale Order. Thus, even if prior to the Sale Poulsen held any interest in the IP, he consented to the Sale of the IP free and clear of any interest he held therein. *See, e.g.*, Sale Order, at p. 11-12.

10. The sale of the IP to TRADS, along with all the other Acquired Assets, closed on December 16, 2013 (the "Closing"). As this Court has already found and determined, TRADS relied upon the fact that it would be acquiring the IP free and clear of all interests and claims, including any asserted by Poulsen, in making its decision to offer $154 million in the bidding process, and that finding and determination has never been disturbed. *See* Sale Order, at p. 14. Subsequent to the Sale, TRADS has relied upon the Sale Order and the fact that it purchased the IP free and clear of all assets in running its business.

11. Yet, on or about October 15, 2014, more than ten months after the Closing, Michael Brauser ("Brauser"), who is, upon information and belief, the Chairman and Vice

President of, and a Director of TBO and who was evidently acting on its behalf,[6] informed TRADS that TBO had purported to purchase any interests Poulsen might have had in the IP, and asserted two related claims against TRADS: first, Defendant asserted that Poulsen had an ownership interest in the IP, which he had transferred to TBO; second, Defendant asserted that Poulsen did not receive adequate notice of the sale of the IP, rendering the Sale Order ineffective with regard to Poulsen.

12.     This Court's Sale Order, which is binding upon the world, is fully dispositive of TBO's spurious claim.  The Sale Order found that Poulsen had received notice of and had consented to the Sale free and clear of his interests, and that the IP was sold to TRADS free and clear of all other interests, including Poulsen's.  Sale Order, at pp. 4 & 11-12.  TBO could not possibly have purchased an interest in the IP from Poulsen because Poulsen had no such interest to sell.  Poulsen never held any direct interest in the IP.  And, in any event, after the entry of the Sale Order, the only person that the Defendant could have purchased any interest in the IP from was TRADS.  This Court's Sale Order, which has never been disturbed, is therefore fully dispositive of this litigation.

13.     In fact, while these additional facts are unnecessary for the relief Plaintiff seeks, TBO itself had full notice of the Sale and Sale Order through its officers and a subsidiary company when it engaged in the purported purchase of Poulsen's alleged interest.  The Debtor served the Sale Order on both Brauser and Derek Dubner ("Dubner"), then the General Counsel of the Debtor, later counsel to TRADS after the Sale, and now, upon information and belief, the Chief Executive Officer of TBO, and Interactive Data, LLC ("Interactive"), a TBO subsidiary. The Debtor also served the Sale Order on Interactive.  All failed to object to the Sale Order.

---

[6] Initially, Brauser did not explain that it was, in fact, TBO that had purchased Poulsen's purported interest in the IP. Accordingly, TRADS previously sued Brauser, Interactive, and Marlin Capital Partners I, LLC, a company that Brauser manages.

14.     Moreover, after the Closing, Poulsen and Brauser had extensive and ongoing involvement in the Debtor's bankruptcy case, primarily concerning the division of the Sale proceeds paid by TRADS, further demonstrating their knowledge of (and consent to) the Sale and its implications.  Yet, neither Poulsen, nor Brauser, Dubner, Interactive, or TBO, has ever moved for reconsideration of, moved for relief from, or taken any other actions to modify or abrogate this Court's Sale Order.

15.     The Sale of the IP and other Acquired Assets to TRADS free and clear of any interest cannot be undone at this late date.  The Sale Order ordered, adjudged, and decreed that "if any or all of the provisions of this Order are hereafter reversed, modified, or vacated by a subsequent order of this Court or any other court, such reversal, modification, or vacatur shall not affect the validity and enforceability of the Sale or any sale, transfer or assignment under the Stalking Horse APA or obligation or right granted pursuant to the terms of this Order (unless stayed pending appeal prior to the Closing) . . .".  Sale Order, at p. 20.  Similarly, the Sale Order ordered, adjudged, and decreed that "[a]ny party objecting to this Order must exercise due diligence in filing an appeal, pursuing a stay and obtaining a stay prior to the Closing, or risk its appeal being foreclosed as moot."  Sale Order, at pp. 38-39.  However, despite receiving notice, neither Poulsen, nor Brauser, Dubner, or Interactive, objected to the Sale or appealed the Sale Order—not even after the Sale closed.  *See* Sale Order, at p. 20.

16.     Thus, TBO's assertion of its interest in the IP on October 15, 2014, more than 10 months after the Closing, is completely meritless.  Poulsen, Brauser, Dubner, Interactive, and TBO itself all had, at the time of the purported transfer of the IP from Poulsen to TBO, actual knowledge that, pursuant to the Sale Order, the IP had long ago been sold to TRADS free and clear of any legal interest that Poulsen conceivably held in it.  In the face of that knowledge TBO

cannot maintain that it nonetheless managed to magically acquire an actual and enforceable legal interest in the IP.

17.     Because TRADS rejects each and every part of the Defendant's claims and the conclusions of those claims, this dispute constitutes an "actual controversy" within the meaning of 28 U.S.C. § 2201 and Fed. R. Bankr. P. 7001(9) between TRADS and the Defendant regarding the ownership of the IP prior to the Sale, the effect of the Sale Order, the adequacy of the notice to Poulsen, the effect of Poulsen's failure to object to the Sale, and the resulting ownership of the IP following the Sale.  Therefore, to enforce this Court's Sale Order, TRADS requests a declaration that (1) the IP was the exclusive property of the Debtor before the Sale, and (2) in any event, upon the issuance of the Sale Order and subsequent Sale, any claims by Poulsen to rights in the IP were extinguished, and the IP passed free and clear to TRADS.  In addition, TRADS is entitled to injunctive relief barring Defendant from ever attempting to collect license fees or other payments from TRADS on account of the IP and requiring Defendant to turn over any IP (including any codes or passwords that would enable TRADS to access such IP) in its possession, custody or control or in the possession, custody or control of any of its officers or employees, or of any persons within the Defendant's control or acting in concert with the Defendant.

## Parties

18.     Plaintiff TransUnion Risk and Alternative Data Solutions, Inc., is a Delaware corporation with its principal place of business at 555 West Adams Street, Chicago, Illinois, and is authorized to transact business in the State of Florida.

19.     Defendant The Best One, Inc., is a Florida corporation.  Upon information and belief, its principal place of business is 4400 Biscayne Boulevard, Suite 850, Miami, Florida.

## Jurisdiction and Venue

20.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.  Venue of this adversary proceeding is proper in this District pursuant to 28 U.S.C. § 1409(a).  This is a "core" matter under 28 U.S.C. § 157 in that, among other things, it concerns an "order[] approving the sale of property" of the estate.  28 U.S.C. § 157(n).  Pursuant to paragraph 51 of the Sale Order, this Court retained jurisdiction over the issues implicated in this adversary proceeding.[7]

## Background

### i.   *The Creation and Importance of the IP*

21.     The Debtor's business had several components, but, as relevant here, its core business consisted of collecting and running searches across numerous databases simultaneously in order to identify patterns and locate individuals and other information.  BOLT is an "[a]pplication component that is comprised of a proprietary language and sets of scripts that are written in BOLT that are the core of the IP that link the disparate data sets together."  Schedule 1.1(a)(ii) to the Stalking Horse APA, [ECF No. 610-4], at 35.  The BParser Code is "the 'code converter' application that converts BOLT code to C++," a universal programming language.  *Id*. Together, this IP formed a component that acted as a "binding agent" for the heart of the Debtor's business, which is allowing it to manage and analyze diverse data, and was a primary

---

[7] Specifically, the Sale Order provided that the Court "retain[s] jurisdiction to (a) interpret, implement and enforce the terms and provisions of th[e Sale] Order, the Bidding Procedures Order, and the Stalking Horse APA, including all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith, in all respects, and (b) to decide any disputes concerning th[e Sale] Order, the Bidding Procedures Order or the Stalking Horse APA, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Stalking Horse APA, the Bidding Procedures Order or th[e Sale] Order including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Acquired Assets and any Assigned Contracts and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the Acquired Assets to the Buyer free and clear of all Interests."  Sale Order, at p. 39

driver of the $154 million in consideration (without any holdback relating to the IP) that TRADS paid in the Sale.

22.     The IP was created for the Debtor by a number of the Debtor's employees in the course of their employment at the Debtor, and thus was the exclusive property of the Debtor at all times. *See* Stalking Horse APA, § 2.6(f)(i), [ECF No. 610-1]. Upon information and belief, Poulsen, the Debtor's then-Chief Science Officer, worked on developing the IP in his capacity as an employee of the Debtor. Indeed, upon information and belief, 40 or more programmers employed by the Debtor were also involved in creating the IP. Upon information and belief, the IP was created using the Debtor's hardware, and stored on the Debtor's servers, and the development of this core IP was at the heart of the scope of duties of the employees who worked on it. Upon information and belief, Poulsen was a full-time employee of the Debtor when he worked on the IP, and received significant compensation, including equity in the Debtor.

23.     Specifically, upon information and belief, Poulsen received payments from the Debtor and Hank Asher, the principal shareholder and founder of the Debtor, and had his expenses paid by them. Upon information and belief, the Debtor or Asher also paid for the homes that Poulsen leased in his name during the years of his employment, in return for his services provided to the Debtor. In addition, upon information and belief, any payments made by the Debtor or Asher to Poulsen or to others on Poulsen's behalf were in return for his efforts as Chief Science Officer of Debtor, and were an aspect of Debtor's employment of Poulsen. And Poulsen has admitted that, from the Debtor's inception, he "agreed to make a contribution of services and time to [the Debtor] . . . in exchange for equity interests in the [Debtor]." *See* Poulsen Joinder, ¶ 3, at p. 2.

24.     Thus, any role that Poulsen had in the creation of the IP was a part of his duties as an employee of the Debtor, and was done with the assistance of other employees and utilizing resources of the Debtor.  *See* Disclosure Schedules to Stalking Horse APA, § 2.6(f), [ECF No. 610-5].

ii.     ***The Sale of the IP to TRADS Free and Clear***

25.     The Debtor sold the IP to TRADS as part of the Sale, free and clear of all Interests (as defined in the Sale Order).  Specifically, paragraph T of the Sale Order provided that "[t]he Debtor may sell, convey and assign the acquired Assets to the Buyer free and clear of all Interests . . . ."  Sale Order, at p. 11.  Section 1.9 of the Stalking Horse APA expressly provides that, "except for the Assumed Liabilities" (not applicable here), "[Debtor's] sale, transfer, conveyance, assignment and delivery of the Acquired Assets to [TRADS] shall be free and clear of all Interests, including Security interests . . . of any kind or character . . .".  Sale Order, Exhibit D, at 12.  *See also id*. at 1-2, § 1.1(a)(ii).  In addition, the Stalking Horse APA defined the IP as "Intellectual Property" that is an "Acquired Asset."  *See* Stalking Horse APA, Schedule 1.1(a)(ii).

26.     In connection with the Sale this Court expressly and specifically found and determined that:

> [T]o the extent that Ole Poulsen holds or asserts any interests of any kind in the BParser code converter software used or useful by the Debtor in the conduct of the Business (the "BParser Code") or any other Business Assets, such BParser Code and other Business Asset shall be deemed an Acquired Asset and may be sold to the Buyer free and clear of all such interests pursuant to section 363 (f) and/or 363 (h) of the Bankruptcy Code because (among other reasons) such interests are in bona fide dispute and Ole Poulsen has been provided actual notice of and an opportunity to object to and be heard with respect to the Sale and he did not timely file an objection.

Sale Order, at p. 12.

27.     The Sale of the IP free and clear of any interest of Poulsen's was a material element of the Sale and the Stalking Horse APA, and this Court has already held that TRADS relied upon it in deciding whether to acquire those Assets at all and in determining how much to pay for them.  Sale Order, at p. 14.  If the core asset of the Debtor were to be acquired subject to the ownership claims of Poulsen and others, TRADS would not have paid, without financial protection, anything close to $154 million.  *Id.*

**iii.**   ***Defendant's Officers' Pre-Sale Involvement in the Bankruptcy Proceedings***

28.     Upon information and belief, Brauser is the Chairman, the Vice President, and a Director of TBO, and he has acted on behalf of TBO in its interactions with TRADS.

29.     Brauser was involved in the Debtor's bankruptcy proceedings almost from the beginning.  Upon information and belief, Brauser was approached as a source of exit financing prior to the filing of the bankruptcy petition by the Debtor.  However, upon information and belief, after he failed to gain control of the Debtor's board of directors in return for providing exit financing in advance of the petition, Brauser proceeded to form Data Acquisition Group, LLC ("DAG"), with Jules Kroll ("Kroll") (then a profit interest holder and creditor of the Debtor), Thomas Glocer ("Glocer") (then also a profit interest holder and creditor of the Debtor), and several others.  Upon information and belief, Kroll and Glocer proceeded to transfer their claims against the Debtor to DAG, in which Brauser was a significant equity holder, and of which Brauser was a manager.  Brauser also formed, held equity in, and acted as a manager of Applied Data Sciences, LLC ("ADS").  Upon information and belief, during the bankruptcy but prior to the Sale, Brauser used DAG and ADS in several attempts to acquire various assets of and related to the Debtor.

30.    For instance, upon information and belief, prior to the entry of the Sale Order, Brauser, acting through DAG and ADS, filed a proposed Joint Plan of Reorganization, under which Brauser would have made decisions on behalf of those two companies.  *See* Disclosure Statement in Support of Joint Plan of Reorganization, [ECF No. 261], at 2.  Additionally, upon information and belief, Brauser, once more acting through DAG and ADS, attempted and failed to purchase Technology Investors, Inc.'s secured claim against the Debtor.

31.    Similarly, upon information and belief, Dubner is currently TBO's Chief Executive Officer.

32.    Prior to and during the bankruptcy, Dubner "provide[d] legal representation on general corporate matters" to the Debtor, Declaration of Disinterestedness ¶ 2, at p. 1 [ECF No. 167, p. 4], and by mid-July of 2013, the Debtor was Dubner's "sole client," *id*. ¶ 4.  In fact, upon information and belief, Dubner served as the Debtor's General Counsel prior to and during the bankruptcy proceedings.

**iv.    *Repeated Service Resulting in Knowledge of and Consent to the Sale***

33.    Upon information and belief, the Sale Order and other Sale-related documents were served upon Poulsen, Brauser, Dubner, and Interactive—all now closely associated with the Defendant.

34.    Specifically, Poulsen, upon information and belief, now serves as TBO's Chief Scientific Officer.  Upon information and belief, Brauser is not only a Director of TBO, but also serves as its Chairman and Vice President.  As noted, Dubner is TBO's Chief Executive Officer.  Finally, Interactive is owned by TBO, with Dubner serving as Interactive's CEO, and Poulsen, upon information and belief, serving as Interactive's Chief Technology Officer.  *See* Defendants' Motion to Dismiss Complaint for Declaratory Judgment [Adv. Proc. No. 14-01793, ECF No. 6],

at 3 "[TBO] . . . owns the defendant, Interactive Data, LLC."); Declaration of Derek Dubner

[Adv. Proc. No. 14-01793, ECF No. 6-1], ¶ 1, at p. 1 ("I am the CEO of Interactive Data,

LLC.").

35.     Furr & Cohen, P.A., the Debtor's bankruptcy counsel ("Furr & Cohen"), caused a

copy of the Order Approving Bidding Procedures and Notice of Bid Deadline, Auction, and Sale

Hearing (the "Order Approving Bidding Procedures"), [ECF. No. 351], to be mailed to Poulsen

at his then-address of record—specifically "2633 SO OCEAN BLVD[,] BOCA RATON[,] FL

33487" (Poulsen's "Florida Address")—on October 28, 2013.  *See* Certificate of Service

Regarding Order Approving Bidding Procedures, [ECF No. 369-1], at 5.  Upon information and

belief, this notice was not returned as undeliverable.  Furr & Cohen also served the Order

Approving Bidding Procedures, on Brauser, Dubner, and Interactive.  *See* Supplemental

Certificate of Service Regarding Order Approving Bidding Procedures, [ECF No. 372], at pp. 8

& 10; Certificate of Service [ECF No. 369-1] at pp. 2 & 21.  Upon information and belief, these

notices were not returned as undeliverable either.  In accordance with this Court's Order

Approving Bidding Procedures, Furr & Cohen also caused the Notice of the Order Approving

Bidding Procedures to be published in three newspapers, including the national edition of the

*Wall Street Journal*, on October 28, 2013.  *See* Certificate of Service of Sale Notice By

Publication, [ECF No. 374].

36.     Additionally, upon information and belief, Furr & Cohen further caused copies of

the Notice of Filing Stalking Horse APA, [ECF No. 389], and the Debtor's Motion for Order

Approving Sale, [ECF No. 390], along with the exhibits thereto, to be mailed to Poulsen at his

Florida Address on November 4, 2013.  *See* Certificate of Service, [ECF No. 400], at 2.  Upon

information and belief, this mailing likewise was never returned as undeliverable.  Notably,

Exhibit A to the Debtor's Motion for Order Approving Sale was a proposed order authorizing, *inter alia*, the same relief as was actually granted by this Court in the Sale Order in paragraphs T and V. *See* ECF No. 390 (Proposed Sale Order), at pp. 9-10. That Motion thus provided Poulsen with clear and unequivocal notice that the IP would be sold, free and clear of any alleged interests he might claim to hold. *See id.* (Motion), at pp. 6-7; ECF No. 390-2 (Schedule 1.1(a)(ii)), at  p. 35.[8]

37.    Upon information and belief, on November 13, 2013, Poulsen contacted Furr & Cohen via email, and requested (i) a copy of the Debtor's Disclosure Statement and Plan of Liquidation filed on October 31, 2013 [ECF Nos. 377, 378], and (ii) that his mailing address be updated to 18800 Bull Springs Road, Bend, Oregon 97701 (Poulsen's "Oregon Address") from this Florida Address. Furr & Cohen complied with Poulsen's requests, and promptly caused Poulsen's mailing address to be updated to his Oregon Address in all relevant records.

38.    Accordingly, Furr & Cohen caused a copy of the Sale Order, as entered by this Court, and the exhibits thereto to be served upon Poulsen at his Oregon Address. *See* ECF No. 694, Exhibit A at p. 16.    Additionally, Furr & Cohen served the Sale Order on Brauser, Dubner, and Interactive.[9] *See id.*, at  pp. 2, 5, 6, and 10.

39.    Notably, the Sale Order expressly found and determined that "timely, adequate, and sufficient notice of the Sale Motion and the relief sought therein . . . the Auction, the Sale Hearing, and the deadlines for filing Stalking Horse APA Objections, objections to the Bidding Procedures, the Sale and the Sale Motion" had been provided, and that "no other or further notice

---

[8] This motion was also served on Interactive's address, c/o "John O Schaeffer[,] 3057 Peachtree Industrial Blvd[,] Suite 100, Duluth, GA 30097." Certificate of Service, [ECF No. 400], at 5. Upon information and belief, John Schaeffer was the then-President of Interactive Data, and was a creditor of the Debtor. *See* Voluntary Petition, [ECF No. 1], at pp. 21, 36, 39 and 47.

[9] Brauser was served individually and in connection with his involvement with DAG and ADS. *See* Exhibit A to Certificate of Service, [ECF No. 694], at 2 & 5 (Sale Order sent to ADS via Brauser, and to DAG at same address).

[was] necessary or . . . required." Sale Order, at p. 4. Neither Poulsen, nor Brauser, nor Dubner, nor Interactive ever appealed this or any other aspect of the Sale Order, and they certainly did not exercise "due diligence" in pursuing such an appeal, as required by that Order. Sale Order, at p. 39. They also failed to file a motion with this Court to vacate or modify the Sale Order.

40.     In sum, despite being on notice of the clear and unambiguous provisions of the Sale Order and other Sale-related documents that the Sale would be free and clear of any purported interests of Poulsen in the IP, at no point did Poulsen, Brauser, Dubner, Interactive, or TBO ever object to the Sale or appeal the Sale Order, let alone seek to obtain a stay of the Sale Order pending the resolution of any appeal, despite the warning in the Sale Order of the consequences of the failure to do so. *See*, *e.g.*, Sale Order at pp. 38-39.

**v.     *The Actual Involvement of Defendant's Officers in the Sale Process***

41.     Defendant's awareness of the Sale and its effects is even more obvious because Brauser and Dubner actually occupied meaningful roles with respect to the Debtor and the Sale.

42.     Specifically, upon information and belief, Brauser (now TBO's Chairman, Vice President, and Director), once more acting through DAG and ADS, made a bid for the Debtor as part of the stalking-horse bidding process. In connection with that bid, on September 17, 2013, Brauser executed a non-disclosure agreement on behalf of DAG, and promised "not to disclose . . . [or] use the [information received] for any purpose other than the evaluation of a possible business transaction between the Parties." *See* Stalking Horse APA, Schedule 1.1(a)(ix), [ECF No. 610-4], at 44.

43.     Additionally, Dubner (now the CEO of both TBO and Interactive) was the Debtor's general counsel during the time of the Sale, and in that capacity, was involved in reviewing and approving many of the Sale-related documents. Indeed, Dubner, was served with

a copy of the Sale Order, *see* Certificate of Service, [ECF No. 694], Exhibit A at p. 8, and the

prior Order Approving Bidding Procedures, *see* Certificate of Service, [ECF No. 369-1], at 21.

In addition, Dubner attended the auction held on November 20-21, 2013 at which TRADS made

the highest and best offer for the Acquired Assets.

44.     Accordingly, it is simply impossible to believe that the Defendant did not know of

the Sale and its implications.  Moreover, by failing to object, Brauser and Dubner—respectively

the Chairman and CEO of TBO—consented to the Sale.

### vi.     *Involvement of Poulsen, Brauser, and Dubner in the Debtor's Bankruptcy Case Concerning the Sale Proceeds*

45.     The involvement of Poulsen, Brauser, and Dubner in the Debtors' bankruptcy

case did not end with the Sale.  Shortly after the Closing, Poulsen and Brauser actively

participated in the case in the hope of obtaining a significant portion of the $154 million paid by

TRADS for the Debtor's business, including the IP.

46.     After the Sale Order, one firm, Salazar Jackson, LLP, came to represent Poulsen,

DAG, ADS, Dubner, Kroll, and Glocer.  *See* Corrected Supplement to Verified Statement of

Salazar Jackson, LLP as to Representation of Multiple Creditors, [ECF No. 850], at 2.  These

parties, acting effectively in concert, proceeded to object to various aspects of the Debtor's

Amended Plan and the claim for administrative expense status for certain claims made by Mr.

Asher's two daughters, who had run the Debtor's operations following the commencement of the

bankruptcy case.  *See, e.g.*, ECF Nos. 916 & 1156.  And, several weeks after the Sale Order was

mailed to Poulsen, he joined Kroll and Glocer in their adversary proceeding against Technology

Investors, Inc., the Debtor's largest secured creditor, seeking to have its secured claims

recharacterized as equity.  *See* Poulsen Joinder.  Thus, upon information and belief, Brauser,

working through intermediaries, and Poulsen remained actively involved in the bankruptcy

proceedings for many months after the entry of the Sale Order. They were obviously well aware of the Sale of the IP to TRADS. Indeed, the very purpose of their participation in the bankruptcy case was to maximize their take of the Sale proceeds. And Dubner was also presumably kept apprised of these proceedings throughout, since he was represented by the same law firm.

47. Notably, on April 14, 2014—four months after the entry of the Sale Order—Poulsen, along with Kroll and Glocer, filed a Limited Objection to the Debtor's amended liquidation plan in an effort to preserve certain aspects of his adversary proceeding against Technology Investors, Inc. *See* Limited Objection of Jules B. Kroll, Thomas Glocer, and Ole Poulsen to Confirmation of the Debtor's Amended Plan of Liquidation [ECF No. 916]. In that Limited Objection, Poulsen acknowledged the validity and effect of the Sale Order, arguing that Debtor had "no on-going business to manage, and there is no going-concern value to preserve[] [because t]he Debtor has sold substantially all of its assets for the purchase price of $154 million, and it has filed a plan of liquidation." *Id.* at 2. Poulsen also made clear that he had no intention of either asserting any purported right to challenge the Sale Order or attempting to unwind any part of the Sale, stating instead that "[a]ll that remains is to adjudicate remaining estate claims and causes of action . . . and then to distribute any and all such assets to the holders of Allowed unsecured claims, if any, and Allowed Equity Interests." *Id.* And that Limited Objection was filed by Salazar Jackson, LLP, which also represented not only Dubner, but the Brauser-controlled DAG and ADS.

48. Given their participation in these post-Sale matters, there simply can be no dispute that Poulsen, Brauser, and Dubner were well aware of the terms of the Sale for over 10 months. Nor can it be seriously maintained that TBO is not itself aware of these terms by virtue of Brauser and Dubner, two of its most senior officers. Yet Brauser, Dubner, Poulsen, and TBO

chose to take no action concerning Poulsen's purported "ownership" of the IP.  To the contrary, Brauser and Poulsen sought to maximize their share of the Sale proceeds—an effort entirely at odds with the Defendant's current assertion that the Sale was ineffective.

**vii.    *Defendant's Purported "Purchase" of the IP and Assertion of Interest***

49.    Yet, upon information and belief, at some point after the Sale, Defendant purported to buy Poulsen's alleged interest in the IP.  That purported "purchase" can have no effect upon TRADS, which fully owns the IP, free and clear of any interest of Defendant or Poulsen.

50.    First, Poulsen never had any direct ownership interest in the IP because he was generously compensated, including through the granting of equity in the Debtor, for his work on the IP as an employee of the Debtor along with numerous other employees of the Debtor, using the Debtor's hardware.  Second, Poulsen received notice of the Sale and the Sale Order and never objected to it.  Third, TBO too was fully aware that the Sale Order had extinguished any right Poulsen might once have had in the IP, and knew that it had never been appealed or challenged.  Thus, the Defendant cannot claim to have made any *bona fide*, good faith purchase of Poulsen's alleged interests.  *See* Sale Order, at p. 20, 22, & 38-39.

51.    Nevertheless, on October 15, 2014, Brauser, evidently acting on behalf of TBO, telephoned TRADS and spoke with Christopher Cartwright, a TRADS executive.  In this conversation and subsequent communications, Brauser asserted that the Defendant owned the IP on account of its purported purchase of Poulsen's alleged interest in the IP.

**viii.    *Events Leading to Defendant's Assertions of IP Ownership***

52.    While this Court need not so find to enter judgment for Plaintiff, Defendant's assertion of its purported ownership interest in the IP smacks of bad faith.  Defendant's sudden

assertion of its purported "ownership" of the IP arose only after TRADS reminded Dubner and

two other individuals who had previously worked for the Debtor and TRADS and had

subsequently gone to work for Interactive and yet another company that is, upon information and

belief, controlled by Brauser, of their obligations under certain confidentiality and non-compete

agreements with TRADS. Upon information and belief, Defendant's assertion of an ownership

interest in the IP also coincided with its retention of Poulsen as its Chief Scientific Officer and of

Interactive's retention of Poulsen as its Chief Technology Officer.  Indeed, the very name of

Defendant—"The Best One"—is an obvious and improper attempt to steal the name of the

Debtor that TRADS acquired—TLO or "The Last One"—and confuse consumers. Specifically,

Dubner, who, as noted, had previously served as the general counsel of the Debtor prior to and

during the Debtor's bankruptcy case and subsequently served in the same role for TRADS after

the Sale Closed, left TRADS in June 2014, and in or around October 2014 became the CEO of

both TBO and Interactive, TBO's subsidiary.  Similarly, on September 26, 2014, James Reilly

("Reilly"), an employee of the Debtor and, later, TRADS, left TRADS, telling certain officers

and employees of TRADS that he would be doing work for Marlin Capital Partners I, LLC

("Marlin"), a Miami-based private equity firm that is, upon information and belief, managed by

Brauser.  *See* Declaration of Michael Brauser [Adv. Proc. No. 14-01793, ECF No. 6-2], ¶ 1.

Upon information and belief, this representation was false; Reilly, in fact, took the position of

President and Chief Operating Officer of Interactive in October of 2014, which is owned by the

Defendant.  And, finally, in or around October 2014, Daniel MacLachlan ("McLachlan"), the

former CFO of the Debtor, began working for Marlin.

      53.     Dubner, MacLachlan, and Reilly all were subject to confidentiality agreements

executed with the Debtor and TRADS, and MacLachlan and Reilly were both subject to non-

compete agreements as well.[10]  On October 9, 2014, TRADS sent letters to Reilly and

MacLachlan reminding them of their obligations under these agreements.

54.     Shortly thereafter Brauser called Cartwright and asserted TBO's purported

ownership of the IP.  Thus, the Defendant's attempt to circumvent the Sale Order—of which the

Defendant had actual knowledge—came only after TRADS raised its contractual rights under

these confidentiality and non-compete agreements.  Defendant's meritless claim of ownership of

the IP is an obvious pretense.

### The Existence of an "Actual Controversy" Between TRADS and TBO

55.     Based upon the foregoing, it is clear that an actual controversy exists between

TRADS and the Defendant over the ownership of the IP prior to the Sale, the validity of the Sale

Order, the adequacy of notice to Poulsen, and the present ownership of the IP.  Thus, while

TRADS believes that Poulsen never had any interest in the IP, the Defendant evidently asserts

that he did.  Moreover, while TRADS believes that the Sale Order was effective and that the IP

was sold to TRADS free and clear of any interest that Poulsen might have had, the Defendant

apparently asserts that the Sale Order could not affect Poulsen's rights, because he was never

properly served with notice of the Sale.  TRADS disputes this assertion, because service was

properly accomplished, and takes the position that this Court's unappealed Sale Order is

effective as written.   The Defendant evidently disagrees, contending that Poulsen still owned the

IP, and that it validly purchased the IP from Poulsen.  TRADS rejects that position entirely,

because Poulsen had nothing to sell, a fact of which the Defendant was fully aware.  Finally,

---

[10] Notably, Furr & Cohen served both MacLachlan and Reilly with the Sale Order, *see* ECF No. 694, at  pp. 15 and 11, as well as well as the prior Order Approving Bidding Procedures, *see* Certificate of Service, [ECF No. 369-1], at pp. 16 &  18.  Additionally, MacLachlan also attended the auction held on November 20-21, 2013 at which the Debtor declared TRADS to have made the highest and best offer for the Acquired Assets.  Finally, subsequent to the Sale, Salazar Jackson, LLP—counsel for Dubner and the Brauser-controlled entities DAG and ADS—came to represent MacLachlan as well.  *See* Corrected Supplement to Verified Statement of Salazar Jackson, LLP as to Representation of Multiple Creditors, [ECF No. 850], at 2.  Thus, senior employees of TBO and its subsidiary own companies had intimate and long-standing knowledge of the Sale Order.

TRADS takes the position that the time to modify the Sale Order has long since passed, and that Defendant's actions to-date have violated (among other provisions) ¶¶ 14 and 19 of the Sale Order, at pp. 22 and 24.

56.     Accordingly, as set forth in 28 U.S.C. § 2201 and Fed. R. Bankr. P. 7001(9), an "actual controversy" exists between TRADS and TBO regarding Poulsen's claimed ownership interest in the IP prior to the Sale, the effect of the Sale Order, the adequacy of the notice to Poulsen, and the current ownership of the IP.

57.     These fundamental disagreements cannot be resolved except by a declaration of this Court regarding Poulsen's original ownership interest in the IP, the effect of the Sale Order, the adequacy of the notice to Poulsen (and Brauser, Dubner, and Interactive), and the ownership of the IP.

## Count I
### (Declaratory Judgment)

58.     TRADS repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

59.     Pursuant to Fed. R. Bankr. P. 7001(9), Fed. R. Civ. P. 57 and 28 U.S.C. § 2201, this Court is authorized to issue a declaratory judgment where a "case of actual controversy" exists within its jurisdiction, and may thus "declare the rights and other legal relations of any interested party" seeking such a declaration.

60.     An actual controversy exists between TRADS and the Defendant concerning Poulsen's assertion of  any interest in the IP, the effect of the Sale Order, the adequacy of the notice to Poulsen, and the current ownership of the IP.

61.     This Court should declare that TRADS owns the IP free and clear of any interest of Poulsen and the Defendant because Poulsen never had any ownership interest in the IP.

Poulsen was an employee of the Debtor when he worked on the IP, and received generous compensation including an equity interest in the Debtor in return for his contribution of time and services to the Debtor related to the IP.  Thus, the IP was a work made for hire that was the exclusive property of the Debtor at the time of the Sale.  *See* 17 U.S.C. §§ 101 & 201(b).

62.     In addition, this Court should declare that TRADS owns the IP free and clear of any interest of Poulsen because Poulsen was given adequate advance notice of the Sale of the IP free and clear of his interests, if any.   This Court should also declare that TRADS owns the IP free and clear of any interest of the Defendant because the Debtor sold the IP to TRADS free and clear of Poulsen's interests, if any, and, therefore, he had no interests in the IP to sell to the Defendant.

63.     This Court should further declare that even if Poulsen somehow retained some ownership interest in the IP after the Sale to TRADS, that interest was extinguished by virtue of the Sale Order, and Poulsen's (and TBO's) failure to appeal the Sale Order and failure to move for relief from the Sale Order.

64.     This Court should also declare that the Defendant is bound by the Sale Order, because (a) its claimed interest in the IP is derivative of Poulsen's purported interest, and Poulsen had notice of the Sale and the Sale Order and did not object, and (b) the Defendant's officers were also provided notice of the Sale and Sale order and did not object.

65.     This Court should further declare that the Defendant took any possible interests of Poulsen in the IP with actual knowledge of the terms of the Sale Order.

66.     In addition, this Court should declare that, since Defendant and individuals closely related to it knew of the Sale Order at the time of the purported purchase of the IP from

Poulsen and sought to obtain some or all of the proceeds of the Sale, Defendant is estopped from asserting both that the Sale was ineffective and that it has any interest in the IP.

67.     This Court should also declare that the Defendant has violated the Sale Order, including, without limitation, paragraphs 14 and 19 thereof, by interfering and attempting to interfere in TRADS's "use and enjoyment of the Acquired Assets based on or related to" Poulsen's purported interests and its failure to "surrender possession or control of [the] Acquired Assets to" TRADS.  Sale Order, at pp. 22 and 24.

68.     In addition, this Court should declare that the Defendant is estopped from asserting any ownership interests over the IP for the additional reason that it delayed in asserting such rights, knowing full well that TRADS had paid $154 million to acquire full ownership of the IP.  Defendant cannot wait to assert its claim, with full awareness of TRADS's acquisition of the IP in full, in order to harass TRADS and engage in patently unfair business tactics that interfere with TRADS's contractual rights.

69.     Put simply, this Court should declare that TRADS owns the IP in full, and Defendant has no interest in the IP whatsoever.

## **Prayer for Relief**

**WHEREFORE,** plaintiff TRADS respectfully requests that this Court:

(a) Declare that:

(i)     Poulsen never had any ownership interest in the IP;

(ii)    Poulsen was given adequate advance notice of the Sale of the IP free and clear of Poulsen's ownership interests, if any;

(iii)   The IP was sold to TRADS free and clear of Poulsen's interests, if any;

(iv)    The Defendant, which purports to have acquired an interest in the IP from Poulsen and which itself got Notice of the Sale and the Sale Order, is estopped from seeking to modify or otherwise obtain relief from the Sale Order;

(v)    The Defendant is estopped from asserting any ownership interests in the IP and from seeking to collect any license fees or other sums from Plaintiff on account of the IP; and

(vi)    TRADS owns the IP in full, and Defendant has no ownership interest in the IP;

(b)    Enter Judgment in favor of plaintiff TRADS;

(c)    Order the Defendant, its officers, its employees, and all persons within the Defendant's control or acting in concert with the Defendant, to turn over any and all copies of the IP (including any codes or passwords that would enable TRADS to access such IP) in their possession, custody, or control; and

(d)    Grant Plaintiff TRADS such other relief as this Court may deem just and appropriate.

Dated: January 13, 2015

/s/ *Brian K. Gart*
Brian K. Gart
BERGER SINGERMAN LLP
350 East Las Olas Blvd., Suite 1000
Fort Lauderdale, Florida 33301
Phone (954) 712-5130
Fax: (954) 523-2872
Florida Bar No. 381152
E-mail:  bgart@bergersingerman.com

-and-

Philip D. Anker (admitted *pro hac vice*)
Douglas F. Curtis
Marc M. Allon (admitted *pro hac vice*)
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Phone: (212) 230-8800
Fax: (212) 230-8888

*Attorneys for the Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

    **I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on the 13th day of January 2015, by electronic transmission through the Court's CM/ECF system upon all parties on the attached CM/ECF Service List.

                */s/  Brian K. Gart*

                Brian K. Gart

## <u>CM/ECF SERVICE LIST</u>

- Philip D. Anker     philip.anker@wilmerhale.com, yolande.thompson@wilmerhale.com
- Robbie T Boone     rboone@bergersingerman.com
- Brian K Gart     bgart@bergersingerman.com,
  clamb@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com
- Arthur H Rice     arice.ecf@rprslaw.com