## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION
### www.flsb.uscourts.gov

In Re:                                                          Case No.  13-20853 (PGH)
                                                                Chapter 11

TLFO, LLC,

      Reorganized Debtor.
_____/

TRANSUNION RISK AND
ALTERNATIVE DATA SOLUTIONS,
INC.,

         Plaintiff,

      v.                                                       Adversary Pro. No. 14-01793 (PGH)

THE BEST ONE, INC., and OLE
POULSEN,

        Defendants.
_____/

### SECOND AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

      Plaintiff TransUnion Risk and Alternative Data Solutions, Inc. ("TRADS"), as and for its

complaint against defendants The Best One, Inc. ("TBO") and Ole Poulsen ("Poulsen")

(collectively, the "Defendants"), states and alleges as follows:

### Preliminary Statement

      1.    This is a complaint to enforce the terms of this Court's order, entered on

December 13, 2013, approving the sale of substantially all of the assets of the above-captioned

(now reorganized) debtor (the "Debtor")[1], to Plaintiff [ECF No. 610] (the "Sale Order").  It seeks

a declaratory judgment that, pursuant to the terms of the Sale Order, TRADS owns the core

assets it acquired from the Debtor, free and clear of an extraordinarily belated claim of TBO and

_____

[1] At the time of the Sale (as defined below) the Debtor was called TLO, LLC.  It subsequently changed its name to
TLFO, LLC.

Poulsen.[2]

2.      In December 2013, TRADS acquired substantially all of the assets of the Debtor (the "Acquired Assets"), as more fully set forth in the Sale Order .[3]  TRADS paid the Debtor $154 million for the Acquired Assets, a substantial sum that permitted the Debtor to pay all of its creditors in full and provide a meaningful return to equity.

3.      The Sale Order provided that the sale of the Acquired Assets to TRADS (the "Sale"), pursuant to Sections 363(b), (f), and (h) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), was, *inter alia*, "free and clear of all liens, claims, encumbrances, liabilities and other obligations and other interests."  Sale Order, at p. 12.  Thus, the Sale Order expressly ordered, adjudged, and decreed that TRADS "is a good faith purchaser of the Acquired Assets, free and clear of Interests, and is hereby granted and entitled to all of the protections provided to such a good faith purchaser under section 363 of the Bankruptcy Code . . . ."  Sale Order, at p. 20.

4.      The core of the Debtor's business was its intellectual property, including the BParser code converter software (the "BParser Code") and the BOLT software language ("BOLT") (collectively, along with any other intellectual property used or useful by the Debtor in the conduct of the business of the Debtor at any point prior to the Sale in which either Poulsen or TBO now assert or claim to hold an interest, the "IP").  The IP was included in the Acquired Assets sold by the Debtor to TRADS.  Without the IP, TRADS would not have paid $154

---

[2] TRADS has also filed a Motion to Enforce the Sale Order and for Contempt against TBO in the main bankruptcy proceeding, [ECF No. 1282], Case No. 13-20853 (S.D. Fla.) (PGH).  TRADS believes that this Court can afford it full and complete relief pursuant to that motion.  In an abundance of caution, and to avoid any prolonged procedural skirmishes, it also filed a complaint in this Adversary Proceeding.  The Court consolidated the motion pending in the main case with this Adversary Proceeding "for administrative purposes."  [ECF No. 1297].

[3] Capitalized terms not defined herein shall the meaning ascribed to them in the Sale Order.  The full terms of the Sale are set forth in that certain asset purchase agreement attached to the Sale Order as Exhibit A (as amended or modified, the "Stalking Horse APA"), [ECF No. 610-1].

million for the Acquired Assets.

5.    In connection with the Sale, the Debtor represented that it was the sole owner of the IP.  Upon information and belief, the IP was created by a large team of over 40 employees of the Debtor, including Poulsen, then the Debtor's Chief Science Officer, and an equity holder in the Debtor.  Upon information and belief, this team used the Debtor's hardware to create the IP, and its members, including Poulsen, were compensated by the Debtor for their work.   The Debtor represented to TRADS that any involvement by Poulsen had been in his capacity as an employee of the Debtor and for the benefit of the Debtor.  Indeed, Poulsen himself has admitted that, from the time of the Debtor's inception, he "agreed to make a contribution of services and time to [the Debtor] . . . in exchange for equity interests in the [Debtor]."  *See* Ole Poulsen's Joinder in Glocer and Kroll's First Amended Complaint for Recharacterization of Claim Numbers 35 and 36 Filed by Technology Investors, Inc. ("Poulsen Joinder"), ¶ 3, at p. 2 [Adv. Proc. No. 13-01943, ECF No. 17].  Thus, the IP was work made for hire, in which Poulsen never had any ownership interest (other than indirectly through his equity interest in the Debtor).

6.    Nevertheless, before closing the Sale and paying $154 million to the Debtor, TRADS required that the Sale Order confirm, *inter alia*, that its acquisition of the IP was free and clear of any possible claim by Poulsen.  This Court's Sale Order so confirmed.

7.    The Debtor served the Sale Order (as well as the motion for its entry and related papers) on Poulsen.  This Court has already found and determined both that the Debtor provided Poulsen with advance notice of the Sale by mailing all documents to him, and that Poulsen consented to the Sale by failing to object.  Sale Order, at pp. 4 & 11-12.  Those findings have never been challenged or disturbed.  *Id.*

8.    Despite repeatedly receiving notice of the Sale and the Sale Order, Poulsen has

- 3 -

never objected to the Sale, appealed the Sale Order, or sought to modify the Sale Order. Thus, even if prior to the Sale Poulsen held any interest in the IP, he consented to the Sale of the IP free and clear of any interest he held therein. *See, e.g.*, Sale Order, at p. 11-12.

9.      The sale of the IP to TRADS, along with all the other Acquired Assets, closed on December 16, 2013 (the "Closing"). As this Court has already found and determined, TRADS relied upon the fact that it would be acquiring the IP free and clear of all interests and claims, including any asserted by Poulsen, in making its decision to offer $154 million in the bidding process, and that finding and determination has never been disturbed. *See* Sale Order, at p. 14. Subsequent to the Sale, TRADS has relied upon the Sale Order and the fact that it purchased the IP free and clear of all assets in running its business.

10.     Yet, on or about October 15, 2014, more than ten months after the Closing, Michael Brauser ("Brauser"), who is, upon information and belief, the Chairman and Vice President, and a Director, of TBO and who was evidently acting on its behalf,[4] informed TRADS that TBO had purported to purchase any interests Poulsen might have had in the IP, and asserted two related claims against TRADS: first, TBO asserted that Poulsen had an ownership interest in the IP, which he had transferred to TBO; second, TBO asserted that Poulsen did not receive adequate notice of the sale of the IP, rendering the Sale Order ineffective with regard to Poulsen.

11.     This Court's Sale Order, which is binding upon the world, is dispositive of Poulsen's and TBO's spurious claim. The Sale Order found that Poulsen had received notice of and had consented to the Sale free and clear of his interests, and that the IP was sold to TRADS

---

[4] Initially, Brauser did not explain that it was, in fact, TBO that had purchased Poulsen's purported interest in the IP. Accordingly, TRADS previously sued Brauser, Interactive, and Marlin Capital Partners I, LLC ("Marlin"), a company that Brauser manages. Upon information and belief, Marlin has entered into a long-term consulting agreement with TBO, under which Marlin acts as a strategic advisor to TBO, providing recommendations on organizational structure, capital structure, future financing needs, future acquisitions or strategic transactions, marketing, and general business strategy. Upon information and belief, Marlin also holds restricted stock units in TBO.

free and clear of all other interests, including Poulsen's. Sale Order, at pp. 4 & 11-12. TBO could not possibly have purchased an interest in the IP from Poulsen because Poulsen had no such interest to sell. Poulsen never held any direct interest in the IP. And, in any event, after the entry of the Sale Order, the only person that TBO could have purchased any interest in the IP from was TRADS. This Court's Sale Order, which has never been disturbed, therefore dictates the outcome of this action.

12.    In fact, while these additional facts are unnecessary for the relief Plaintiff seeks, TBO itself had full notice of the Sale and Sale Order through its officers and a subsidiary company when it engaged in the purported purchase of Poulsen's alleged interest. The Debtor served the Sale Order on both Brauser and Derek Dubner ("Dubner"), then the General Counsel of the Debtor, later counsel to TRADS after the Sale, and now, upon information and belief, the Chief Executive Officer of TBO, and Interactive Data, LLC ("Interactive"), a TBO subsidiary. The Debtor also served the Sale Order on Interactive. All failed to object to the Sale Order.

13.    Moreover, after the Closing, Poulsen and Brauser had extensive and ongoing involvement in the Debtor's bankruptcy case, primarily concerning the division of the Sale proceeds paid by TRADS, further demonstrating their knowledge of (and consent to) the Sale and its implications. Yet, neither Poulsen, nor Brauser, Dubner, Interactive, or TBO, has ever moved for reconsideration of, moved for relief from, or taken any other actions to modify or abrogate, this Court's Sale Order.

14.    The Sale of the IP and other Acquired Assets to TRADS free and clear of any interest cannot be undone at this late date. The Sale Order ordered, adjudged, and decreed that "if any or all of the provisions of this Order are hereafter reversed, modified, or vacated by a subsequent order of this Court or any other court, such reversal, modification, or vacatur shall

not affect the validity and enforceability of the Sale or any sale, transfer or assignment under the Stalking Horse APA or obligation or right granted pursuant to the terms of this Order (unless stayed pending appeal prior to the Closing) . . . ."  Sale Order, at p. 20.  Similarly, the Sale Order ordered, adjudged, and decreed that "[a]ny party objecting to this Order must exercise due diligence in filing an appeal, pursuing a stay and obtaining a stay prior to the Closing, or risk its appeal being foreclosed as moot."  Sale Order, at pp. 38-39.  However, despite receiving notice, neither Poulsen, nor Brauser, Dubner, or Interactive, objected to the Sale or appealed the Sale Order—not even after the Sale closed.  *See* Sale Order, at p. 20.

15.    Thus, TBO's assertion of its interest in the IP on October 15, 2014, more than 10 months after the Closing, is meritless.  Poulsen, Brauser, Dubner, Interactive, and TBO itself all had, at the time of the purported transfer of the IP from Poulsen to TBO, actual knowledge that, pursuant to the Sale Order, the IP had long ago been sold to TRADS free and clear of any legal interest that Poulsen conceivably held in it.  In the face of that knowledge TBO cannot maintain that it nonetheless managed to acquire an actual and enforceable legal interest in the IP.

16.    Because TRADS rejects each and every part of TBO's claims and the conclusions of those claims, this dispute constitutes an "actual controversy" within the meaning of 28 U.S.C. § 2201 and Fed. R. Bankr. P. 7001(9) between TRADS and TBO regarding the effect of the Sale Order, the adequacy of the notice to Poulsen, the ownership of the IP prior to the Sale, the effect of Poulsen's failure to object to the Sale, and the resulting ownership of the IP following the Sale.  Therefore, to enforce this Court's Sale Order, TRADS requests a declaration with respect to TBO that (1) the IP that TBO purports to have purchased from Poulsen was the exclusive property of the Debtor before the Sale; (2) in any event, upon the issuance of the Sale Order and subsequent Sale, any claims by Poulsen to rights in the IP he purportedly sold to TBO were

- 6 -

extinguished, and such IP in fact passed free and clear to TRADS; (3) TBO has no right to acquire the IP from Poulsen; (4) TBO has no right to attempt to collect license fees or other payments from TRADS on account of the IP it purports to have purchased from Poulsen; and (4) the Sale Order requires TBO to turn over to TRADS any IP that it purports to have purchased from Poulsen (including any codes or passwords that would enable TRADS to access such IP) now in its possession, custody or control, or in the possession, custody or control of any of its officers, employees, or of any persons within TBO's control or acting in concert with TBO.

17.     Subsequent to TRADS's filing of its First Amended Complaint, Poulsen, through counsel, suggested that Poulsen still had an interest in the IP as well.  However, whether that be a residuum of interest retained in the IP "sold" to TBO, or an interest related to IP that he claims that was not "sold" to TBO, such interest does not, and cannot, exist.  Poulsen's work on the IP sold to TRADS was done for the Debtor, and the Debtor had full title to it.  Even if it did not, any interest Poulsen may have held was extinguished pursuant to this Court's Sale Order.

18.     Because TRADS rejects each and every part of Poulsen's claims and the conclusions of those claims, this dispute constitutes an "actual controversy" within the meaning of 28 U.S.C. § 2201 and Fed. R. Bankr. P. 7001(9) between TRADS and Poulsen regarding the effect of the Sale Order, the adequacy of the notice to Poulsen, the ownership of the IP prior to the Sale, the effect of Poulsen's failure to object to the Sale, and the resulting ownership of the IP following the Sale.  Therefore, in order to enforce this Court's Sale Order, TRADS also requests a declaration with respect to Poulsen that, to the extent that he now claims to hold or asserts any interest in any IP, (1) such IP was the exclusive property of the Debtor before the Sale; (2) in any event, upon the issuance of the Sale Order and subsequent Sale, any claims by Poulsen to rights, holdings, or interests in any IP were extinguished, and such IP in fact passed free and clear to

TRADS; (3) Poulsen has no right to sell any such IP to anyone; (4) Poulsen has no right to attempt to collect license fees or other payments from TRADS on account of any such IP; and (5) the Sale Order requires Poulsen to turn over to TRADS any IP (including any codes or passwords that would enable TRADS to access such IP) now in his possession, custody or control.

### Parties

19.    Plaintiff TransUnion Risk and Alternative Data Solutions, Inc., is a Delaware corporation with its principal place of business at 555 West Adams Street, Chicago, Illinois, and is authorized to transact business in the State of Florida.

20.    Defendant The Best One, Inc., is a Florida corporation.  Upon information and belief, its principal place of business is 4400 Biscayne Boulevard, Suite 850, Miami, Florida.

21.    Defendant Ole Poulsen currently is, upon information and belief, a resident of Bend, Oregon, and resides at 18800 Bull Springs Road, Bend, Oregon 97701.

### Jurisdiction and Venue

22.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.  Venue of this adversary proceeding is proper in this District pursuant to 28 U.S.C. § 1409(a).  This is a "core" matter under 28 U.S.C. § 157 in that, among other things, it concerns an "order[] approving the sale of property" of the estate.  28 U.S.C. § 157(n).  Pursuant to paragraph 51 of the Sale Order, this Court retained jurisdiction over the issues implicated in this adversary proceeding.[5]

---

[5] Specifically, the Sale Order provided that the Court "retain[s] jurisdiction to (a) interpret, implement and enforce the terms and provisions of th[e Sale] Order, the Bidding Procedures Order, and the Stalking Horse APA, including all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith, in all respects, and (b) to decide any disputes concerning th[e Sale] Order, the Bidding Procedures Order or the Stalking Horse APA, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Stalking Horse APA, the Bidding Procedures Order or th[e Sale] Order including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the

## Background

i.   *The Creation and Importance of the IP*

23.    The Debtor's business had several components, but, as relevant here, its core business consisted of collecting and running searches across numerous databases simultaneously in order to identify patterns and locate individuals and other information.   BOLT is an "[a]pplication component that is comprised of a proprietary language and sets of scripts that are written in BOLT that are the core of the IP that link the disparate data sets together."   Schedule 1.1(a)(ii) to the Stalking Horse APA, [ECF No. 610-4], at 35.   The BParser Code is "the 'code converter' application that converts BOLT code to C++," a universal programming language.  *Id.* Together, this IP formed a component that acted as a "binding agent" for the heart of the Debtor's business, which is allowing it to manage and analyze diverse data, and was a primary driver of the $154 million in consideration (without any holdback relating to the IP) that TRADS paid in the Sale.

24.    The IP was created for the Debtor by a number of the Debtor's employees in the course of their employment at the Debtor, and thus was the exclusive property of the Debtor at all times.  *See* Stalking Horse APA, § 2.6(f)(i), [ECF No. 610-1].  Upon information and belief, Poulsen, then the Debtor's Chief Science Officer, worked on developing the IP in his capacity as an employee of the Debtor.   Indeed, upon information and belief, 40 or more programmers employed by the Debtor were also involved in creating the IP.  Upon information and belief, the IP was created using the Debtor's hardware and stored on the Debtor's servers, and the development of this core IP was at the heart of the scope of duties of the employees who worked on it.  Upon information and belief, Poulsen was a full-time employee of the Debtor when he

---

Acquired Assets and any Assigned Contracts and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the Acquired Assets to the Buyer free and clear of all Interests."  Sale Order, at p. 39

6286370-1

worked on the IP, and received significant compensation, including equity in the Debtor.

25.    Specifically, upon information and belief, Poulsen received payments from the Debtor and Hank Asher ("Asher"), the principal shareholder and founder of the Debtor, and had his expenses paid by them.  Upon information and belief, the Debtor or Asher also paid for the homes that Poulsen leased in his name during the years of his employment, in return for his services provided to the Debtor.  In addition, upon information and belief, any payments made by the Debtor or Asher to Poulsen or to others on Poulsen's behalf were in return for his efforts as Chief Science Officer of Debtor, and were an aspect of Debtor's employment of Poulsen. And Poulsen has admitted that, from the Debtor's inception, he "agreed to make a contribution of services and time to [the Debtor] . . . in exchange for equity interests in the [Debtor]."  *See* Poulsen Joinder, ¶ 3, at p. 2.

26.    Thus, any role that Poulsen had in the creation of the IP was a part of his duties as an employee of the Debtor, and was done with the assistance of other employees and utilizing resources of the Debtor.  *See* Disclosure Schedules to Stalking Horse APA, § 2.6(f), [ECF No. 610-5].

ii.    *The Sale of the IP to TRADS Free and Clear*

27.    The Debtor sold the IP to TRADS as part of the Sale, free and clear of all Interests (as defined in the Sale Order).  Specifically, paragraph T of the Sale Order provided that "[t]he Debtor may sell, convey and assign the acquired Assets to the Buyer free and clear of all Interests . . . ."  Sale Order, at p. 11.  Section 1.9 of the Stalking Horse APA expressly provides that, "except for the Assumed Liabilities" (not applicable here), "[Debtor's] sale, transfer, conveyance, assignment and delivery of the Acquired Assets to [TRADS] shall be free and clear of all Interests, including Security interests . . . of any kind or character . . .".  Sale Order, Exhibit

D, at 12.  *See also id*. at 1-2, § 1.1(a)(ii).  In addition, the Stalking Horse APA defined BOLT

and BParser (among other things) as "Intellectual Property" that were "Acquired Asset[s]."  *See*

Stalking Horse APA, Schedule 1.1(a)(ii).

28.     In connection with the Sale this Court expressly and specifically found and

determined that:

> [T]o the extent that Ole Poulsen holds or asserts any interests of
> any kind in the BParser code converter software used or useful by
> the Debtor in the conduct of the Business (the "BParser Code") or
> any other Business Assets, such BParser Code and other Business
> Asset shall be deemed an Acquired Asset and may be sold to the
> Buyer free and clear of all such interests pursuant to section 363 (f)
> and/or 363 (h) of the Bankruptcy Code because (among other
> reasons) such interests are in bona fide dispute and Ole Poulsen
> has been provided actual notice of and an opportunity to object to
> and be heard with respect to the Sale and he did not timely file an
> objection.

Sale Order, at p. 12.

29.     The Sale Order defined the term "Business Assets" to mean "all intellectual

property or any of the other assets used or useful by the Debtor in the conduct of the Business of

the Debtor."  *Id*. at p. 11.  Accordingly, "to the extent that Ole Poulsen h[eld] or assert[ed] any

interests of any kind in," *id*. at p. 12, "all intellectual property or any of the other assets used or

useful by the Debtor in the conduct of the Business of the Debtor," *id*. at p. 11; *cf. id*. at p. 12,

this Court:

> a.     found and determined that all such intellectual property and assets in
>        which Poulsen held or asserted "any interests of any kind" were "Business
>        Assets," *id*. at 11, that were to be "deemed . . . Acquired Asset[s]," *id*. at
>        12;
>
> b.     found and determined that the "Debtor [was the] sole and lawful owner of
>        the Acquired Assets," *id*. at p. 10, including such Business Assets, *cf. id*. at
>        pp. 11-12;
>
> c.     found and determined that "any interests of any kind" in such Business

Assets that were "h[eld] or assert[ed]" by Poulsen were "in bona fide dispute," *id*. at p. 12;

d.    found and determined that the "Debtor ha[d] provided timely, adequate, and sufficient notice of the Sale Motion and the relief sought therein (including, without limitation, service of the Sale Notice . . . ), the Auction, the Sale Hearing, and the deadlines for filing Stalking Horse APA objections, objections to the Bidding Procedures, the Sale and the Sale Motion by U.S. mail . . . , in accordance with the Bidding Procedures Order," *id*. at p. 4 (footnote omitted);

e.    found and determined that "[a] reasonable opportunity to object or be heard regarding the Sale and the relief requested in the Sale Motion has been afforded to all interested parties, persons, and entities," *id*.;

f.    found and determined that "[s]uch notice was good and sufficient and appropriate under the circumstances, and no further notice is necessary or shall be required," *id*.;

g.    found and determined that, in particular, "Ole Poulsen has been provided actual notice of and an opportunity to object to and be heard with respect to the Sale and he did not timely file an objection," *id*. at p. 12;

h.    found and determined that all Business Assets in which Poulsen held or asserted an interest could be, and were, "sold to the Buyer free and clear of all such interests pursuant to section 363 (f) and/or 363 (h) of the Bankruptcy Code," *id*.; and

i.    ordered, adjudged, and decreed that the "Stalking Horse APA and the Sale pursuant to the Stalking Horse APA [were] [t]hereby approved and authorized in all respects," *id*. at p. 19.

30.    Notably, Poulsen never appealed from any of the findings, determinations, orders, adjudications, or decrees in the Sale Order, including those listed above.  Nor has he ever moved the Court to afford relief from any such findings, determinations, orders, adjudications, and decrees under Federal Rule of Civil Procedure 60(b), as incorporated by Federal Rule of Bankruptcy Procedure 9024.  The same is true of TBO, Brauser, and Dubner.

31.    The Sale of the IP free and clear of any interest of Poulsen's was a material element of the Sale and the Stalking Horse APA, and this Court has already held that TRADS

- 12 -

relied upon it in deciding whether to acquire those Assets at all and in determining how much to pay for them.  Sale Order, at p. 14.  If the core asset of the Debtor were to be acquired subject to the ownership claims of Poulsen and others, TRADS would not have paid, without financial protection, anything close to $154 million.  *Id*.

### iii.   *TBO's Officers' Pre-Sale Involvement in the Bankruptcy Proceedings*

32.    Like Poulsen, the principals of TBO have themselves been heavily involved in the Debtor's bankruptcy case and have long known of the Sale of the IP to TRADS.

33.    Upon information and belief, Brauser is the Chairman, the Vice President, and a Director of TBO, and he has acted on behalf of TBO in its interactions with TRADS.

34.    Brauser was involved in the Debtor's bankruptcy proceedings almost from the beginning.  Upon information and belief, Brauser was approached as a source of exit financing prior to the filing of the bankruptcy petition by the Debtor.  However, upon information and belief, after he failed to gain control of the Debtor's board of directors in return for providing exit financing in advance of the petition, Brauser proceeded to form Data Acquisition Group, LLC ("DAG"), with Jules Kroll ("Kroll") (then a profit interest holder and creditor of the Debtor), Thomas Glocer ("Glocer") (then also a profit interest holder and creditor of the Debtor), and several others.  Upon information and belief, Kroll and Glocer proceeded to transfer their claims against the Debtor to DAG, in which Brauser was a significant equity holder, and of which Brauser was a manager.  Brauser also formed, held equity in, and acted as a manager of Applied Data Sciences, LLC ("ADS").  Upon information and belief, during the bankruptcy but prior to the Sale, Brauser used DAG and ADS in several attempts to acquire various assets of and related to the Debtor.

35.    For instance, upon information and belief, prior to the entry of the Sale Order,

Brauser, acting through DAG and ADS, filed a proposed Joint Plan of Reorganization, under which Brauser would have made decisions on behalf of those two companies.  *See* Disclosure Statement in Support of Joint Plan of Reorganization, [ECF No. 261], at 2.  Additionally, upon information and belief, Brauser, once more acting through DAG and ADS, attempted and failed to purchase Technology Investors, Inc.'s secured claim against the Debtor.

36.    For his part, upon information and belief, Dubner is currently TBO's Chief Executive Officer.

37.    Prior to and during the bankruptcy, Dubner "provide[d] legal representation on general corporate matters" to the Debtor, Declaration of Disinterestedness ¶ 2, at p. 1 [ECF No. 167, p. 4], and by mid-July of 2013, the Debtor was Dubner's "sole client," *id*. ¶ 4.  In fact, upon information and belief, Dubner served as the Debtor's General Counsel prior to and during the bankruptcy proceedings.

iv.    *Repeated Service Resulting in Knowledge of and Consent to the Sale*

38.    Upon information and belief, the Sale Order and other Sale-related documents were served upon Poulsen, Brauser, Dubner, and Interactive—all now closely associated with TBO.

39.    Specifically, Poulsen, upon information and belief, now serves as TBO's Chief Scientific Officer, and owns 5,000,000 shares of TBO common stock.  Upon information and belief, Brauser is not only a Director of TBO, but also serves as its Chairman and Vice President.  As noted, Dubner is TBO's Chief Executive Officer.  Finally, Interactive is owned by TBO, with Dubner serving as Interactive's CEO, and Poulsen, upon information and belief, serving as Interactive's Chief Technology Officer.  *See* Defendants' Motion to Dismiss Complaint for Declaratory Judgment [Adv. Proc. No. 14-01793, ECF No. 6], at 3 "[TBO] . . . owns the

defendant, Interactive Data, LLC."); Declaration of Derek Dubner [Adv. Proc. No. 14-01793, ECF No. 6-1], ¶ 1, at p. 1 ("I am the CEO of Interactive Data, LLC.").

40.    Furr & Cohen, P.A., the Debtor's bankruptcy counsel ("Furr & Cohen"), caused a copy of the Order Approving Bidding Procedures and Notice of Bid Deadline, Auction, and Sale Hearing (the "Order Approving Bidding Procedures"), [ECF. No. 351], to be mailed to Poulsen at his then-address of record—specifically "2633 SO OCEAN BLVD[,] BOCA RATON[,] FL 33487" (Poulsen's "Florida Address")—on October 28, 2013. *See* Certificate of Service Regarding Order Approving Bidding Procedures, [ECF No. 369-1], at 5. Upon information and belief, this notice was not returned as undeliverable. Furr & Cohen also served the Order Approving Bidding Procedures, on Brauser, Dubner, and Interactive. *See* Supplemental Certificate of Service Regarding Order Approving Bidding Procedures, [ECF No. 372], at pp. 8 & 10; Certificate of Service [ECF No. 369-1] at pp. 2 & 21. Upon information and belief, these notices were not returned as undeliverable either. In accordance with this Court's Order Approving Bidding Procedures, Furr & Cohen also caused the Notice of the Order Approving Bidding Procedures to be published in three newspapers, including the national edition of the *Wall Street Journal*, on October 28, 2013. *See* Certificate of Service of Sale Notice By Publication, [ECF No. 374].

41.    Additionally, upon information and belief, Furr & Cohen further caused copies of the Notice of Filing Stalking Horse APA, [ECF No. 389], and the Debtor's Motion for Order Approving Sale, [ECF No. 390] (the "Sale Motion"), along with the exhibits thereto, to be mailed to Poulsen at his Florida Address on November 4, 2013. *See* Certificate of Service, [ECF No. 400], at 2. Upon information and belief, this mailing likewise was never returned as undeliverable. Notably, Exhibit A to the Sale Motion was a proposed order authorizing, *inter*

- 15 -

*alia*, the same relief as was actually granted by this Court in the Sale Order in paragraphs T and V. *See* ECF No. 390 (Proposed Sale Order), at pp. 9-10. Thus, the Sale Motion provided Poulsen with clear and unequivocal notice that the IP would be sold, free and clear of any alleged interests he might claim to hold. *See id.* (Motion), at pp. 6-7; ECF No. 390-2 (Schedule 1.1(a)(ii)), at p. 35.[6]

42.    Upon information and belief, on November 13, 2013, Poulsen contacted Furr & Cohen via email, and requested (i) a copy of the Debtor's Disclosure Statement and Plan of Liquidation filed on October 31, 2013 [ECF Nos. 377, 378], and (ii) that his mailing address be updated to 18800 Bull Springs Road, Bend, Oregon 97701 (Poulsen's "Oregon Address") from this Florida Address. Furr & Cohen complied with Poulsen's requests, and promptly caused Poulsen's mailing address to be updated to his Oregon Address in all relevant records.

43.    Accordingly, Furr & Cohen caused a copy of the Sale Order, as entered by this Court, and the exhibits thereto to be served upon Poulsen at his Oregon Address. *See* ECF No. 694, Exhibit A at p. 16.    Additionally, Furr & Cohen served the Sale Order on Brauser, Dubner, and Interactive.[7] *See id.*, at  pp. 2, 5, 6, and 10.

44.    Notably, the Sale Order expressly found and determined that "timely, adequate, and sufficient notice of the Sale Motion and the relief sought therein . . . the Auction, the Sale Hearing, and the deadlines for filing Stalking Horse APA Objections, objections to the Bidding Procedures, the Sale and the Sale Motion" had been provided, and that "no other or further notice [was] necessary or . . . required." Sale Order, at p. 4. Neither Poulsen, nor Brauser, nor Dubner,

---

[6] This motion was also served on Interactive's address, c/o "John O Schaeffer[,] 3057 Peachtree Industrial Blvd[,] Suite 100, Duluth, GA 30097." Certificate of Service, [ECF No. 400], at 5. Upon information and belief, John Schaeffer was the then-President of Interactive Data, and was a creditor of the  Debtor. *See* Voluntary Petition, [ECF No. 1], at pp. 21, 36, 39 and 47.

[7] Brauser was served individually and in connection with his involvement with DAG and ADS. *See* Exhibit A to Certificate of Service, [ECF No. 694], at 2 & 5 (Sale Order sent to ADS via Brauser, and to DAG at same address).

nor Interactive ever appealed this or any other aspect of the Sale Order, and they certainly did not exercise "due diligence" in pursuing such an appeal, as required by that Order.  Sale Order, at p. 39.  They also failed to file a motion with this Court to vacate or modify the Sale Order.

45.    In sum, despite being on notice of the clear and unambiguous provisions of the Sale Order and other Sale-related documents that the Sale would be free and clear of any purported interests of Poulsen in the IP, at no point did Poulsen, Brauser, Dubner, Interactive, or TBO ever object to the Sale or appeal (or seek relief from) the Sale Order, let alone seek to obtain a stay of the Sale Order pending the resolution of any appeal, despite the warning in the Sale Order of the consequences of the failure to do so.  *See*, *e.g.*, Sale Order at pp. 38-39.

**v.    *The Actual Involvement of TBO's Officers in the Sale Process***

46.    TBO's awareness of the Sale and its effects is even more obvious because Brauser and Dubner were actively involved in the process leading to the Sale and otherwise in the Debtor's bankruptcy case.

47.    Specifically, upon information and belief, Brauser (now TBO's Chairman, Vice President, and Director), once more acting through DAG and ADS, made a bid for the Debtor as part of the stalking-horse bidding process.  In connection with that bid, on September 17, 2013, Brauser executed a non-disclosure agreement on behalf of DAG, and promised "not to disclose . . . [or] use the [information received] for any purpose other than the evaluation of a possible business transaction between the Parties."  *See* Stalking Horse APA, Schedule 1.1(a)(ix), [ECF No. 610-4], at 44.

48.    Additionally, Dubner (now the CEO of both TBO and Interactive) was the Debtor's general counsel during the time of the Sale, and in that capacity, was involved in reviewing and approving many of the Sale-related documents.  Indeed, Dubner, was served with

a copy of the Sale Order, *see* Certificate of Service, [ECF No. 694], Exhibit A at p. 8, and the

prior Order Approving Bidding Procedures, *see* Certificate of Service, [ECF No. 369-1], at 21.

In addition, Dubner attended the auction held on November 20-21, 2013 at which TRADS made

the highest and best offer for the Acquired Assets.

49.     Accordingly, it is simply impossible to believe that TBO did not know of the Sale

and its implications.  By failing to object, Brauser and Dubner—respectively the Chairman and

CEO of TBO—consented to the Sale.

**vi.  *Involvement of Poulsen, Brauser, and Dubner in the Debtor's Bankruptcy Case Concerning the Sale Proceeds***

50.     The involvement of Poulsen, Brauser, and Dubner in the Debtors' bankruptcy

case did not end with the Sale.  Shortly after the Closing, Poulsen and Brauser actively

participated in the case in the hope of obtaining a significant portion of the $154 million paid by

TRADS for the Debtor's business, including the IP.

51.     After the Closing of the Sale, one firm, Salazar Jackson, LLP, came to represent

Poulsen, DAG, ADS, Dubner, Kroll, and Glocer.  *See* Corrected Supplement to Verified

Statement of Salazar Jackson, LLP as to Representation of Multiple Creditors, [ECF No. 850], at

2.  These parties, acting effectively in concert, proceeded to object to various aspects of the

Debtor's Amended Plan and the claim for administrative expense status for certain claims made

by Mr. Asher's two daughters, who had run the Debtor's operations following the

commencement of the bankruptcy case.  *See, e.g.*, ECF Nos. 916 & 1156.  And, several weeks

after the Sale Order was mailed to Poulsen, he joined Kroll and Glocer in their adversary

proceeding against Technology Investors, Inc., the Debtor's largest secured creditor, seeking to

have its secured claims recharacterized as equity.  *See* Poulsen Joinder.  Thus, upon information

and belief, Brauser, working through intermediaries, and Poulsen remained actively involved in

the bankruptcy proceedings for many months after the entry of the Sale Order. They were obviously well aware of the Sale of the IP to TRADS. Indeed, the very purpose of their participation in the bankruptcy case was to maximize their take of the Sale proceeds. And Dubner was also presumably kept apprised of these proceedings throughout, since he was represented by the same law firm.

52.      Notably, on April 14, 2014—four months after the entry of the Sale Order— Poulsen, along with Kroll and Glocer, filed a Limited Objection to the Debtor's amended liquidation plan in an effort to preserve certain aspects of his adversary proceeding against Technology Investors, Inc. *See* Limited Objection of Jules B. Kroll, Thomas Glocer, and Ole Poulsen to Confirmation of the Debtor's Amended Plan of Liquidation [ECF No. 916]. In that Limited Objection, Poulsen acknowledged the validity and effect of the Sale Order, arguing that Debtor had "no on-going business to manage, and there is no going-concern value to preserve[] [because t]he Debtor has sold substantially all of its assets for the purchase price of $154 million, and it has filed a plan of liquidation." *Id*. at 2. Poulsen also made clear that he had no intention of either asserting any purported right to challenge the Sale Order or attempting to unwind any part of the Sale, stating instead that "[a]ll that remains is to adjudicate remaining estate claims and causes of action . . . and then to distribute any and all such assets to the holders of Allowed unsecured claims, if any, and Allowed Equity Interests." *Id*. And that Limited Objection was filed by Salazar Jackson, LLP, which also represented not only Dubner, but the Brauser-controlled DAG and ADS.

53.      Given their participation in these post-Sale matters, there simply can be no dispute that Poulsen, Brauser, and Dubner were well aware of the terms of the Sale. Nor can it be seriously maintained that TBO is not itself aware of these terms by virtue of Brauser and

Dubner, two of its most senior officers.  Yet Brauser, Dubner, Poulsen, and TBO chose to take no action concerning Poulsen's purported "ownership" of the IP.  To the contrary, Brauser and Poulsen sought to maximize their share of the Sale proceeds—an effort entirely at odds with TBO's current assertion that the Sale was ineffective.

### vii.    *TBO's Purported "Purchase" of the IP and Assertion of Interest*

54.    Notwithstanding its knowledge of the Sale, upon information and belief, at some point after the Sale, TBO purported to buy Poulsen's alleged interest in the IP.   Upon information and belief, this purported "purchase" was made shortly after Poulsen signed a one-year employment agreement with TBO, under which Poulsen acquired 5,000,000 shares of TBO's common stock.  Upon information and belief, those 5,000,000 shares gave Poulsen an equity stake in excess of 17% of TBO's outstanding common stock, which he held at the time of his purported "sale" of IP to TBO.

55.    Poulsen's purported "sale" and TBO's purported "purchase" can have no effect upon TRADS, which fully owns the IP, free and clear of any interest of TBO or Poulsen.   First, Poulsen never had any direct ownership interest in the IP because he was generously compensated, including through the granting of equity in the Debtor, for his work on the IP as an employee of the Debtor.   Indeed, Poulsen worked on the IP along with numerous other employees of the Debtor, and did so using the Debtor's hardware.  Second, Poulsen received notice of the Sale and the Sale Order and never objected to either—nor did he ever appeal the Sale Order or timely seek relief under Federal Rule of Procedure 60(b) from any alleged defect of service, notice, or jurisdiction.  Third, TBO too was fully aware that the Sale Order had extinguished any right Poulsen might once have had in the IP, and knew that it had never been appealed or challenged.   Thus, TBO cannot claim to have made any *bona fide*, good faith

- 20 -

purchase of Poulsen's alleged interests.  *See* Sale Order, at p. 20, 22, & 38-39.

56.    Nevertheless, on October 15, 2014, Brauser, evidently acting on behalf of TBO, telephoned TRADS and spoke with Christopher Cartwright, a TRADS executive.  In this conversation and subsequent communications, Brauser asserted that TBO owned the IP on account of its purported purchase of Poulsen's alleged interest in the IP and threatened to initiate litigation unless TRADS satisfied TBO.

**viii.    *Events Leading to TBO's Assertions of IP Ownership***

57.    While this Court need not so find to enter judgment for Plaintiff, TBO's assertion of its purported ownership interest in the IP smacks of bad faith.  Upon information and belief, TBO's assertion of an ownership interest in the IP shortly followed its retention of Poulsen as its Chief Scientific Officer and of Interactive's retention of Poulsen as its Chief Technology Officer. Indeed, TBO's very name—"The Best One"—is an obvious and improper attempt to steal the name of the Debtor that TRADS acquired—TLO or "The Last One"—and confuse consumers. Adding to the confusion, TBO's affiliate Interactive has, upon information and belief, been falsely representing that Asher was its founder.

58.    TBO's sudden assertion of its purported "ownership" of the IP also arose only after TRADS reminded Dubner and two other individuals who had previously worked for the Debtor and TRADS and had subsequently gone to work for Interactive and yet another company that is, upon information and belief, controlled by Brauser, of their obligations under certain confidentiality and non-compete agreements with TRADS.

59.    Specifically, Dubner, who, as noted, had previously served as the general counsel of the Debtor prior to and during the Debtor's bankruptcy case and subsequently served in the same role for TRADS after the Sale Closed, left TRADS in June 2014, and in or around October

2014 became the CEO of both TBO and Interactive, TBO's subsidiary. Similarly, on September 26, 2014, James Reilly ("Reilly"), an employee of the Debtor and, later, TRADS, left TRADS, telling certain officers and employees of TRADS that he would be doing work for Marlin, a Miami-based private equity firm that is, upon information and belief, managed by Brauser, and that, upon information and belief, provides strategic consulting and other services to TBO. *See* Declaration of Michael Brauser [Adv. Proc. No. 14-01793, ECF No. 6-2], ¶ 1. Upon information and belief, this representation was false; Reilly, in fact, took the position of President and Chief Operating Officer of Interactive in October of 2014, which is owned by TBO. And, finally, in or around October 2014, Daniel MacLachlan ("McLachlan"), the former CFO of the Debtor, began working for Marlin.

60.    Dubner, MacLachlan, and Reilly all were subject to confidentiality agreements executed with the Debtor and TRADS, and MacLachlan and Reilly were both subject to non-compete agreements as well.[8]    On October 9, 2014, TRADS sent letters to Reilly and MacLachlan reminding them of their obligations under these agreements.[9]

61.    Shortly thereafter Brauser called Cartwright and asserted TBO's purported ownership of the IP. Thus, TBO's attempt to circumvent the Sale Order—of which it had actual knowledge—came only after TRADS raised its contractual rights under these confidentiality and non-compete agreements. TBO's meritless claim of ownership of the IP is an obvious pretense.

---

[8] Notably, Furr & Cohen served both MacLachlan and Reilly with the Sale Order, *see* ECF No. 694, at pp. 15 and 11, as well as well as the prior Order Approving Bidding Procedures, *see* Certificate of Service, [ECF No. 369-1], at pp. 16 & 18. Additionally, MacLachlan also attended the auction held on November 20-21, 2013 at which the Debtor declared TRADS to have made the highest and best offer for the Acquired Assets. Finally, subsequent to the Sale, Salazar Jackson, LLP—counsel for Dubner and the Brauser-controlled entities DAG and ADS—came to represent MacLachlan as well. *See* Corrected Supplement to Verified Statement of Salazar Jackson, LLP as to Representation of Multiple Creditors, [ECF No. 850], at 2. Thus, senior employees of TBO and its subsidiary own companies had intimate and long-standing knowledge of the Sale Order.

[9] MacLachlan did not comply with his non-competition agreement, and TRADS was required to bring suit to enforce the agreement. On February 10, 2015, the U.S. District Court for the Southern District of Florida entered a preliminary injunction in favor of TRADS and enforcing the agreement against MacLachlan. *See TransUnion Risk and Alternative Data Solutions, Inc. v. MacLachlan*, 14 CV 81485 (S.D. Fla. Feb. 10, 2015).

ix.    *Poulsen's Assertion of an Interest in the IP*

62.    On March, 11, 2015, counsel for Poulsen appeared at a hearing in this Adversary Proceeding.  During the hearing, counsel suggested that Poulsen—despite his purported "sale" of the IP to TBO—had and retained an ownership interest in the IP that could be adversely affected by this Adversary Proceeding were he not named as a defendant.  The Court directed TRADS to file this Second Amended Complaint naming Poulsen as a defendant.

63.    It is unclear whether Poulsen's supposed ownership interest is in some residuum of the IP he purports to have "sold" to TBO, or whether he asserts or claims to hold an interest in IP that he does not purport to have "sold" to TBO.  However, the result is the same in either case.  Since the IP was transferred to TRADS pursuant to the Sale Order, free and clear of all interests, Poulsen no longer has any interest to assert or hold (if he ever held one in the first place)— whether it be a residuum from the purported "sale" of IP to TBO, or an interest he asserts or claims to hold that was not related to the IP he purports to have "sold" to TBO.

**The Existence of an "Actual Controversy" Between TRADS and TBO**

64.    Based upon the foregoing, an actual controversy exists between TRADS and TBO over the ownership of the IP prior to the Sale, the validity of the Sale Order, the adequacy of notice to Poulsen, and the present ownership of the IP.  Thus, while TRADS believes that Poulsen never had any interest in the IP, TBO evidently asserts that he did.  Moreover, while TRADS believes that the Sale Order was effective and that the IP was sold to TRADS free and clear of any interest that Poulsen might have had, TBO apparently asserts that the Sale Order could not affect Poulsen's rights, because he was supposedly never properly served with notice of the Sale.  TRADS disputes this assertion, because service was properly accomplished, and takes the position that this Court's unappealed and undisturbed Sale Order is effective as written.

TBO evidently disagrees, contending that Poulsen still owned the IP, and that it validly purchased the IP from Poulsen.  TRADS rejects that position entirely, because Poulsen had nothing to sell, a fact of which TBO was fully aware.  Finally, TRADS takes the position that the time to modify the Sale Order has long since passed, and that TBO's actions to-date have violated (among other provisions) ¶¶ 14 and 19 of the Sale Order.

65.    Accordingly, as set forth in 28 U.S.C. § 2201 and Fed. R. Bankr. P. 7001(9), an "actual controversy" exists between TRADS and TBO regarding the effect of the Sale Order, the adequacy of the notice to Poulsen, Poulsen's claimed ownership interest in the IP prior to the Sale, and the current ownership of the IP.

66.    These fundamental disagreements cannot be resolved except by a declaration of this Court regarding the effect of the Sale Order, the adequacy of the notice to Poulsen (and Brauser, Dubner, and Interactive), TBO's claimed interest in the IP, and the current ownership of the IP.

**The Existence of an "Actual Controversy" Between TRADS and Poulsen**

67.    Based upon the foregoing, an actual controversy also exists between TRADS and Poulsen over the ownership of the IP prior to the Sale, the validity of the Sale Order, the adequacy of notice to Poulsen, and the present ownership of the IP.  Thus, while TRADS believes that Poulsen never had any interest in the IP, Poulsen evidently asserts that he did.  Moreover, while TRADS believes that the Sale Order was effective and that the IP was sold to TRADS free and clear of any interest that Poulsen might have had, Poulsen apparently asserts that the Sale Order could not affect his rights, because he was supposedly never properly served with notice of the Sale.  TRADS disputes this assertion, because service was properly accomplished, and takes the position that this Court's unappealed and undisturbed Sale Order is

effective as written.  Poulsen evidently disagrees, contending that he still owned the IP.  TRADS rejects that position entirely, because Poulsen is bound by the terms of the Sale Order.  Finally, TRADS takes the position that the time to modify the Sale Order has long since passed, and that Poulsen's actions to-date have violated (among other provisions) ¶¶ 14 and 19 of the Sale Order.

68.     Accordingly, as set forth in 28 U.S.C. § 2201 and Fed. R. Bankr. P. 7001(9), an "actual controversy" exists between TRADS and Poulsen regarding the effect of the Sale Order, the adequacy of the notice to Poulsen, Poulsen's claimed ownership interest in the IP prior to and following the Sale, and the current ownership of the IP.

69.     These fundamental disagreements cannot be resolved except by a declaration of this Court regarding the effect of the Sale Order, the adequacy of the notice to Poulsen, Poulsen's claimed interest in the IP, and the current ownership of the IP.

## <u>Count I</u><br>(Declaratory Judgment)

70.     TRADS repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

71.     Pursuant to Fed. R. Bankr. P. 7001(9), Fed. R. Civ. P. 57 and 28 U.S.C. § 2201, this Court is authorized to issue a declaratory judgment where a "case of actual controversy" exists within its jurisdiction, and may thus "declare the rights and other legal relations of any interested party" seeking such a declaration.

72.     An actual controversy exists between TRADS, on the one hand, and TBO and Poulsen, on the other, concerning the effect of the Sale Order, TBO's and Poulsen's assertion of any interest in the IP notwithstanding the Sale Order, the adequacy of the notice of the Sale to Poulsen, and the current ownership of the IP in light of the Sale Order.

73.     This Court should declare that, pursuant to the Sale Order, TRADS owns the IP

- 25 -

free and clear of any interest of Poulsen or TBO because Poulsen was given adequate advance notice of the Sale of the IP free and clear of his interests, if any, and, therefore, he had no interests in the IP to sell to TBO.

74.    This Court should also declare that TRADS owns the IP free and clear of any purported interest of Poulsen or TBO because Poulsen never had any ownership interest in the IP.  Poulsen was an employee of the Debtor when he worked on the IP, and received generous compensation including an equity interest in the Debtor in return for his contribution of time and services to the Debtor related to the IP.  Thus, the IP was a work made for hire that was the exclusive property of the Debtor at the time of the Sale.  *See* 17 U.S.C. §§ 101 & 201(b).

75.    This Court should further declare that even if Poulsen somehow once had any interest in the IP, that interest was extinguished by the Sale Order, and the failure of Poulsen and TBO to timely appeal the Sale Order or timely move for relief from the Sale Order.

76.    This Court should also declare that TBO is bound by the Sale Order, because (a) its claimed interest in the IP is derivative of Poulsen's purported interest, and Poulsen had notice of the Sale and the Sale Order and did not object, and, in any event, (b) TBO's officers were also provided notice of the Sale and Sale Order and did not object.  This Court should declare that TBO took any possible interests of Poulsen in the IP with actual knowledge of the terms of the Sale Order.  This Court should declare that, since TBO and individuals closely related to it knew of the Sale Order at the time of the purported purchase of the IP from Poulsen and sought to obtain some or all of the proceeds of the Sale, TBO is estopped from asserting both that the Sale was ineffective and that it has any interest in the IP.

77.    This Court should further declare that TBO has violated, and is in contempt of, the Sale Order, including, without limitation, paragraphs 14 and 19 thereof, by interfering and

attempting to interfere in TRADS's "use and enjoyment of the Acquired Assets based on or related to" Poulsen's purported interests and its failure to "surrender possession or control of [the] Acquired Assets to" TRADS.  Sale Order, at pp. 22 and 24.

78.    This Court should also declare that, to the extent that he asserts or claims to hold an interest in any IP, Poulsen has violated, and is in contempt of, the Sale Order, including, without limitation, paragraphs 14 and 19 thereof, by interfering and attempting to interfere in TRADS's "use and enjoyment of the Acquired Assets based on or related to" his purported interests and his failure to "surrender possession or control of [the] Acquired Assets to" TRADS. Sale Order, at pp. 22 and 24.

79.    In addition, this Court should declare that TBO and Poulsen are estopped from asserting any ownership interests over the IP for the additional reason that the Poulsen's and TBO's delay in asserting such rights, knowing full well that TRADS had paid $154 million to acquire full ownership of the IP, was unreasonable.  Neither Poulsen nor TBO, whose purported interest was obtained from Poulsen and is therefore accountable for Poulsen's delay prior to the purported "sale," can wait to assert a claim, with full awareness of TRADS's acquisition of the IP, in order to harass TRADS and engage in patently unfair business tactics that interfere with TRADS's contractual rights.

80.    Put simply, this Court should declare that, pursuant to the Sale Order, TRADS owns the IP in full, and that neither TBO nor Poulsen have any interest in the IP.

**Prayer for Relief**

**WHEREFORE,** plaintiff TRADS respectfully requests that this Court:

(a) Declare that:

(i)    Poulsen was given adequate advance notice of the Sale of the IP free and

clear of Poulsen's ownership interests, if any;

      (ii)    Pursuant to the Sale Order, the IP was sold to TRADS free and clear of Poulsen's interests, if any;

      (iii)    Poulsen never had any ownership interest in the IP;

      (iv)    Poulsen and TBO, which purports to have acquired an interest in the IP from Poulsen and which itself received notice of the Sale and the Sale Order, are barred by the Sale Order and estopped from seeking at this late date to modify or otherwise obtain relief from the Sale Order;

      (v)    TBO and Poulsen are barred by the Sale Order from asserting any ownership interests in the IP and from seeking to collect any license fees or other sums from Plaintiff on account of the IP;

      (vi)    In accordance with the Sale Order, TRADS owns the IP in full, and TBO has no ownership interest in the IP; and

      (vii)    the Sale Order requires TBO, its officers, its employees, and all persons within TBO's control or acting in concert with TBO, to turn over any and all copies of the IP (including any codes or passwords that would enable TRADS to access such IP) in their possession, custody, or control;

      (viii)    the Sale Order requires Poulsen to turn over any and all copies of the IP (including any codes or passwords that would enable TRADS to access such IP) in his possession, custody, or control;

      (ix)    TBO is in contempt of the Sale Order; and

      (x)    to the extent that he asserts or claims to hold any interest in the IP, Poulsen is in contempt of the Sale Order;

- 28 -

(b)      Enter Judgment in favor of plaintiff TRADS; and

(c)      Grant plaintiff TRADS such other relief as this Court may deem just and appropriate.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served by electronic transmission on the 18th day of March, 2015, through the Court's CM/ECF system upon all parties on the attached CM/ECF Service List, and via electronic transmission and first class, U.S. Mail upon all parties listed below.

/s/ *Brian K. Gart*
Brian K. Gart
Florida Bar No.: 381152
bgart@bergersingerman.com
Robbie T. Boone, Jr.
Florida Bar No. 105752
rboone@bergersingerman.com
BERGER SINGERMAN LLP
350 East Las Olas Blvd., Suite 1000
Fort Lauderdale, Florida 33301
Phone (954) 712-5130
Fax: (954) 523-2872

-and-

Philip D. Anker (admitted *pro hac vice*)
Douglas F. Curtis (admitted *pro hac vice*)
Marc M. Allon (admitted *pro hac vice*)
WILMER CUTLER PICKERING HALE
        AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Phone: (212) 230-8800
Fax: (212) 230-8888

*Attorneys for the Plaintiff*

Luis Salazar, Esq.
Salazar Jackson, LLP
2000 Ponce de Leon Boulevard
Suite PH
Coral Gables, FL 33134-4439
Salazar@salazarjackson.com

6286370-1

## <u>CM/ECF SERVICE LIST</u>

- Philip D. Anker     philip.anker@wilmerhale.com, yolande.thompson@wilmerhale.com
- Robbie T Boone     rboone@bergersingerman.com
- Brian K Gart     bgart@bergersingerman.com,
  clamb@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com
- Alvin S. Goldstein     rstanley@furrcohen.com, atty_furrcohen@bluestylus.com
- Arthur H Rice     arice.ecf@rprslaw.com
- Lisa M Schiller     lschiller.ecf@rprslaw.com

6286370-1